BRYAN CAVE LLP
Lloyd A. Palans (LP-8572)
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1943

Attorneys for the Debtors and
Debtors In Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:                                          :        Chapter 11
                                                :
216 West 18 Owner LLC, et al.,                  :        Case Nos. 11-[_____](___)
                                                :
                    Debtors.                    :        (Joint Administration Requested)
                                                :
----------------------------------------------------------x

**DECLARATION OF STEVEN A. CARLSON PURSUANT TO
LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS'
<u>CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS</u>**

I, Steven A. Carlson, hereby declare:

1.        I am a resident of Fairfield County, Connecticut. I am over the age of eighteen

and am competent to testify to the matters set forth herein

2.        I am the Chief Restructuring Officer ("<u>CRO</u>") of 216 West 18 Owner LLC, 216

West 18 Mezz LLC and 216 West 18 Holder LLC (collectively, the "<u>Debtors</u>"), and as such I

have personal knowledge of the matters set forth herein.

3.        I have an extensive background in finance and restructuring, having worked as a

Chief Financial Officer and Chief Restructuring Officer, in addition to holding other positions as

a corporate officer and director in a career of nearly 30 years. I have worked on several Chapter

11 cases including those of Texaco Inc and United Air Lines. Until its merger with Chevron, I

1

spent over 20 years at Texaco in various positions of increasing responsibility and since then have had a number of assignments as an officer, director, and consultant in finance and restructuring. My most recent previous assignment was as a Director and Chief Restructuring Officer for TH Agriculture & Nutrition, LLC (a wholly owned subsidiary of Philips Electronics), where I was the independent officer and director responsible for providing independent analysis and advice on ongoing activities of the Company and as an independent representative in its successful Chapter 11 restructuring case. I have a BA (with Distinction) in Economics from Connecticut College and an MBA in Finance from New York University.

4.      This Declaration is submitted pursuant to Rule 1007-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"). Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge and primarily materials provided by the Debtors and their principals, as well as information provided by retained professionals of the Debtors, or information obtained from my review of relevant documents. Additionally, the opinions asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations, assets and financial condition. If called upon to testify, I would competently testify to the facts set forth herein. I am authorized to submit this Declaration on behalf of each of the Debtors.

5.      This Declaration is divided into three sections. Part I describes the Debtors, their business, and the circumstances leading to the commencement of these bankruptcy cases. Part II describes the relief sought by the Debtors in each of the initial relief requested by the Debtors in certain motions filed contemporaneously herewith (the "First-Day Motions"). Part III contains additional information required by Local Bankruptcy Rule 1007-2.

# I. FACTUAL BACKGROUND.

## A. Corporate Structure of the Debtors.

6.     216 West 18 Owner LLC ("Owner") is a Delaware limited liability company wholly owned by Debtor 216 West 18 Mezz LLC ("Mezz"). Mezz is wholly owned by Debtor 216 West 18 Holder LLC ("Holder"). Holder is a Delaware limited liability company, owned 94.2% by HAJ 18 LLC ("HAJ 18") and 5.8% by JK 18 LLC. HAJ 18, wholly owned by Harry Jeremias ("Jeremias"), is the managing member of Holder. The Debtors do not have any employees.

7.     Owner's only significant asset is its interest in certain real estate located at 216 West 18th Street, New York, New York (the "Mortgaged Property"), which has also been referred to with a different address of 218 West 18th Street based on its official mailing address. Mezz's only significant asset is its equity interest in Owner, and Holder's only significant asset is its equity interest in Mezz.

## B. Pre-Petition Indebtedness.

The Mortgage Loans:

8.     On April 17, 2007, Owner entered into three loan agreements (the "Mortgage Loans") with Bank of America, N.A. (the "Bank") for the purpose of financing the acquisition and development of, and construction on, the Mortgaged Property. In connection with these loan agreements, Owner executed and delivered to the Bank, as obligee, three promissory notes: one in the amount of $27,763,992.82 (the "Acquisition Loan Note"); one in the amount of $10,287,500.00 (the "Building Loan Note"); and one in the amount of $9,948,507.18 (the "Project Loan Note"). Each of the notes was secured by a mortgage on the Mortgaged Property

C076201/0328587/3729565.3

(the Acquisition Loan Mortgage, the Building Loan Mortgage, and the Project Loan Mortgage, respectively), which was executed by Owner and delivered to Mortgage Electronic Registration Systems, Inc. ("MERS"), as mortgagee and nominee for the Bank. Each of the mortgages was duly recorded and perfected.

9.     From the closing of the Mortgage Loans through July 22, 2009, the Bank disbursed $48,000,000 to fund the Mortgage Loans. On November 17, 2010, 216 W 18 Lender LLC (the "Mortgage Lender"), an affiliate of Fishman Holdings North America Inc., purchased the Mortgage Loan from the Bank. As of November 1, 2011, the total amount outstanding under the Mortgage Loans, including the principal amount of $48,000,000 plus interest, costs, fees, penalties and expenses aggregate approximately $74,342,445.35. Based on a preliminary appraisal completed prior to the Debtors' filings, the value of the Mortgaged Property is $62,300,000.00.

The Mezzanine Loan:

10.     Pursuant to that certain mezzanine loan agreement dated as of April 17, 2007 by and between the Bank ("Original Mezz Lender"), as lender, and Mezz, as borrower, (as may be further modified or amended from time to time, the "Mezzanine Loan Agreement"), Original Mezz Lender originated the Mezzanine Loan in the original principal amount of $19,560,000 to Mezz. Additionally, on the Original Closing Date, Mezz, as borrower, entered into that certain Pledge and Security Agreement in favor of Bank as lender in connection with the Mezzanine Loan, and thus, the Mezzanine Loan is secured by the equity in Owner.

11.     Pursuant to that certain memorandum of sale dated as of June 15, 2007 by and between Original Mezz Lender, as seller, and ING Clarion Debt Opportunity Fund II Mezzanine Sub LLC, as purchaser ("Initial Mezz Purchaser"), Original Mezz Lender sold, transferred and

4

assigned to Initial Mezz Purchaser all of Original Mezz Lender's right, title and interest in and to the Mezzanine Loan. Pursuant to that certain memorandum of sale dated as of September 1, 2010 by and between Torchlight Debt Opportunity Fund II Mezzanine Sub, LLC (f/k/a ING Clarion Debt Opportunity Fund II Mezzanine Sub LLC), as seller ("Initial Mezz Seller"), and the Bank, as purchaser, Initial Mezz Seller sold, transferred and assigned to the Bank all of Initial Seller's right, title and interest in and to the Mezzanine Loan.

12. On November 17, 2010, the Mortgage Lender purchased the Mezzanine Loan from the Bank. As of September 14, 2011, the total amount outstanding under the Mezzanine Loan, including the principal amount of $19,560,000, plus interest, costs, fees, penalties and expenses, aggregated approximately $24,632,345.

**C.      Events Leading to Chapter 11 Filings.**

13. The Debtors acquired the Mortgaged Property at a premium in 2007, at the height of the New York real estate market and mere months before the economic crisis of 2008. The Debtors' business plan was highly speculative in that it provided for a complete rehabilitation of the Mortgaged Property, which required a substantial capital investment and precluded any rental income during the renovations. The scheduled improvements on the Mortgaged Property were repeatedly delayed, which impeded the Debtors' ability to enter into lease agreements and generate revenue. Concurrently therewith, the market for leased commercial space slowed dramatically, and the Debtors were unable to obtain rental income as a result, leaving the Debtors heavily leveraged. The financial crisis eviscerated the re-finance market, such that the Debtors were left with very few options. The project was unattractive to the few capital sources that were available during the financial crisis due to the lack of signed leases and the incomplete renovations. As a result, the Debtors ran out of money and were unable to service the debt.

C076201/0328587/3729565.3

14.     On October 22, 2009, MERS, as nominee for the Bank, commenced a foreclosure action of the Mortgage in the Supreme Court of the State of New York, County of New York (Index No. 650622/2009 E, the "Foreclosure Action").  On that same date, MERS filed an application seeking the appointment of a temporary receiver.  By order (the "Order Appointing a Receiver") dated November 18, 2009, the Honorable Bernard J. Fried, of the Supreme Court of the State of New York (the "New York Supreme Court"), appointed Andrew L. Herz as the temporary receiver ("Receiver") of the Mortgaged Property.  Pursuant to the Order Appointing a Receiver and subject to the terms thereof, the Court granted the Receiver the power and authority to, among other things, complete construction at the Mortgaged Property and to enter into certain leases for space at the Mortgaged Property.  The Foreclosure Action is pending before the New York Supreme Court.

15.     On December 30, 2010, Mortgage Lender filed a complaint against Jeremias and Tsvi Pluczenik ("Pluczenik") in the New York Supreme Court, seeking to recover certain amounts expended to complete the renovation of the Mortgaged Property pursuant to that certain Completion Guaranty executed by Jeremias and Pluczenik (Index No. 652415/2010 E, the "Completion Guaranty Action").  The Completion Guaranty Action is pending before the New York Supreme Court.

16.     In August 2011, Atlas Capital Group LLC ("Atlas") proposed to the Debtors a prepackaged consensual chapter 11 plan of liquidation (the "Plan") that would resolve the various disputes between the parties and provide a recovery for mechanic lienors and any other unsecured creditors with valid claims against Owner.  Absent the proposed Plan, the Debtors' creditors, other than the Mortgage Lender, would receive no recovery because substantially all the Debtors' assets are secured by the Mortgage, and the Mortgage is undersecured.

C076201/0328587/3729565.3

17.     On September 22, 2011, the Debtors engaged me as the Debtors' Chief Restructuring Officer (the "CRO") to oversee all aspects of the Debtors' business, operations, and potential restructuring pursuant to a certain Employment Agreement (the "Employment Agreement"), a copy of which is attached hereto as **Exhibit A**.

18.     Upon careful consideration of other alternatives, the Debtors determined that the confirmation of a prepackaged chapter 11 liquidating plan, in the form of the Plan, is in the best interests of the Debtors' creditors and other stakeholders. The Plan provides the Debtors and the Debtors' stakeholders with the unique opportunity to resolve the Foreclosure Action and the Completion Guaranty Action, and provides a distribution to the Debtors' other creditors who would otherwise receive nothing in a foreclosure or other liquidation. In that regard, the Plan provides for, *inter alia*, (i) the transfer of the Mortgaged Property to the Mortgage Lender Designee, an affiliate of Atlas; (ii) distributions on account of unsecured claims against the Owner in the amount of 19.6%; (iii) the cancellation of existing equity of the Debtors; and (iv) the resolution of the Completion Guaranty Action.

19.     Prior to filing their cases, the Debtors served their proposed Plan and related disclosure statement (the "Disclosure Statement") on all parties entitled to vote on the Plan, and solicited votes from such parties. The Mortgage Lender is the only creditor in Class 2 under the Plan, and it voted to accept the Plan. The Debtors received nine (9) ballots from creditors in Class 3 entitled to vote on the Plan, and all such creditors accepted the Plan. Thus, all voting classes voted to accept the Plan, an no creditor voted against the Plan.

20.     On November 1, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Cases").

C076201/0328587/3729565.3

## II.  FIRST-DAY MOTIONS.

21.  In an effort to further the smooth and efficient administration of their Cases, and to preserve and maximize the value of their estates, the Debtors are filing the following motions (the "First-Day Motions") concurrently herewith:

A.  Motion for an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Seeking Joint Administration (the "Joint Administration Motion").

B.  Debtors' Motion for Entry of an Order Authorizing the Debtors To File Consolidated List of Creditors.

C.  Debtors' Motion for an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing (the "Cash Collateral Motion").

D.  Motion for an Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Assurance (the "Utilities Motion").

E.  Application for an Order Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) Authorizing the Employment and Retention of Bryan Cave LLP as Attorneys for the Debtors (the "BCLLP Retention Application").

F.  Application for an Order Establishing Uniform Bar Date and Procedures for Filing Proofs of Claim and/or Proofs of Interest, and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion").

G.  Scheduling Motion for Prepackaged Chapter 11 Case (the "Scheduling Motion").

22.  I have reviewed each of the First-Day Motions (including the exhibits attached thereto) and can attest to the truth of the facts set forth therein.  I believe the relief sought in each of the First-Day Motions (a) is necessary to preserve and enhance the value of the Debtors' estates, (b) is integral to the success of the Debtors' cases and confirmation of the proposed Plan, and (c) serves the best interests of the Debtors, and the Debtors' estates and creditors.

C076201/0328587/3729565.3

**A.    Debtors' Motion for an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Seeking Joint Administration.**

23.    Pursuant to the Joint Administration Motion, the Debtors are requesting that these Cases be jointly administered for procedural purposes only.  As set forth above, Holder owns 100% of Mezz, and Mezz owns 100% of Owner.  Accordingly, all of the Debtors are "affiliates" within the meaning of that term in section 101(2) of the Bankruptcy Code.

24.    Joint administration of the Debtors' Cases is warranted because the Debtors are significantly interrelated.  The Debtors share common management.  The finances of the Debtors are intimately related because their only tangible asset is the Mortgaged Property.  Thus, the joint administration of their Cases will expedite and foster each of the Debtors' reorganization efforts.

25.    Virtually all of the notices, applications, motions, other pleadings, hearings, and orders in these Cases will affect all of the Debtors identically.  Thus, the joint administration of these Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  Duplication of substantially identical documents for all three Cases would be extremely wasteful and would unnecessarily overburden the Clerk of the Court with voluminous filings.  A simplified joint caption for the cases will enable parties-in-interest in each of the Cases to be apprised of the various matters before the Court. Accordingly, joint administration is appropriate.

**B.    Debtors' Motion for Entry of an Order Authorizing the Debtors To File a Consolidated List of Creditors.**

26.    The Debtors are requesting authorization to file a consolidated list of their creditors.  Due to the nature of the Debtors' business, the Debtors have very few creditors. Indeed, Holder has no known creditors, and Mezz has only two (2) known creditors.  Owner, the

9

owner and operator of the Debtors' only substantial asset—the Mortgaged Property—has identified only thirteen (13) known creditors.

27.     Thus, the Debtors have identified only fifteen (15) creditors to which notice of certain proceedings in these Cases must be provided.   The Debtors have compiled a computerized list of the names and addresses of their respective creditors and other parties in interest that will receive the required notices and other documents in these Cases.

28.     The Debtors believe that the information, as maintained in their computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the all required notices.   Accordingly, authority to file the Debtors' creditor lists on a consolidated basis, identifying their creditors in the format currently maintained by the Debtors, is appropriate.

C.     **Debtors' Motion for an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing.**

29.     Pursuant to the Cash Collateral Motion, the Debtors are requesting authorization to use certain cash collateral (the "Cash Collateral") of the Mortgage Lender on the terms set forth in the Cash Collateral Motion and the related proposed interim cash collateral order (the "Interim Order").   In particular, the Cash Collateral Motion seeks an order (i) authorizing the Debtors' use of Cash Collateral; (ii) providing adequate protection to the Mortgage Lender for any diminution in value of its interests; (iii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (iv) scheduling a Final Hearing to consider the relief requested in the Motion and the entry of a Final Order and approving the form of notice with respect to the Final Hearing.

C076201/0328587/3729565.3

30.     The Mortgage Lender consents to the use of Cash Collateral only on the terms set forth in the proposed form of Interim Order that accompanies the Cash Collateral Motion. In order for the Debtors to operate the Mortgaged Property in the ordinary course of business and to preserve their bankruptcy estates until confirmation of the Plan, it is critical that the Debtors have immediate authorization to use Cash Collateral pursuant to the terms and conditions set out in detail in the Cash Collateral Motion. All of the Debtors' cash generated from the Mortgaged Property, whether as original collateral or revenues or proceeds of the Mortgaged Property or other prepetition collateral, constitutes cash collateral of the Mortgage Lender.

31.     In addition to allowing the Debtors' business to continue on a normal basis, authorizing use of the Cash Collateral will enable the Debtors to (i) increase their available financial resources; (ii) engender confidence in Owner's tenants; and (iii) fund payments that will be required pursuant to other orders of this Court. Without approval of the use of Cash Collateral as set forth in the Cash Collateral Motion, the Debtors would not be able to find alternative financing, given the nature of the business and state of the economy.

32.     Cash Collateral will only be available pursuant to the terms of the proposed Interim Order, including the budget attached to the Cash Collateral Motion (the "Budget"). The Budget will primarily permit the Debtors to satisfy (i) all payments to be made for insurance and taxes, and (ii) operational costs and expenses arising in connection with the administration of the Debtors' estates, including fees of professionals.

33.     The continued operation of the Debtors' business through use of the Cash Collateral will preserve their value and ultimately enable the Debtors to confirm their proposed Plan. Conversely, if the Debtors are not authorized to use Cash Collateral, the Debtors likely

C076201/0328587/3729565.3

will not be able to continue operating the Mortgaged Property, the Plan will not be confirmed, and the Mortgaged Property will deteriorate in value.

34.    My continued employment as CRO of the Debtors is an integral component of the overall restructuring and the use of Cash Collateral under the Interim Order. The Interim Order provides that, in accordance with Section 543 of the Bankruptcy Code, the Receiver will immediately turn over all property of the Debtors held by the Receiver to the CRO. I, as CRO, will then have the authority to delegate to the Receiver and others the power to perform services with respect to the Mortgaged Property in a similar manner as occurred prepetition, to the extent and as directed by me. The Debtors intend to use bank accounts similar to those used by the Receiver prior to the Petition Date for the operation of the Mortgaged Property. The Receiver will obtain my approval, as CRO, prior to making any payments.

35.    Similarly, the Interim Order provides for me, as CRO, to have the authority postpetition to engage the current manager of the Mortgaged Property, Jeffrey Management Corp. (the "Property Manager"), to manage the Mortgaged Property, including the collection of rent from tenants of the Mortgaged Property, consistent with prepetition practices, as determined by me, as CRO. In connection therewith, the Property Manager will continue to submit a "Request for Approval of Invoices" monthly to the Receiver and me, as CRO, detailing all ordinary course payments for which it seeks approval, and, upon the written approval of the Receiver and me, as CRO, the Property Manager will remit payments of these ordinary course expenditures from the Debtors' bank accounts. The Property Manager will be prohibited from making any payments that are (a) not in the ordinary course of business, (b) not approved by the Receiver and me, as CRO, and/or (c) inconsistent with the Budget absent prior approval from both the Receiver and me, as CRO.

C076201/0328587/3729565.3

36.     In terms of reporting, the Interim Order provides that the Debtors will deliver to the Mortgage Lender on or before the close of business of the fifteenth day of each month (and if such day is not a business day, then the next succeeding business day) a (i) comparison for the prior month of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (ii) cumulative comparison for the period from the Petition Date through the end of the prior month of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information and additional reporting as the Mortgage Lender may request.

37.     The terms and conditions of the Interim Order are fair and reasonable under the circumstances and reflect the Debtors' exercise of reasonable business judgment consistent with the Debtors' fiduciary duties as debtors in possession.  Without the relief granted in the Interim Order, the Debtors will suffer immediate and irreparable harm, and may be forced to suspend or curtail their normal operations.

    **D.**     **Debtors' Motion for an Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Assurance.**

38.     Pursuant to the Utilities Motion, the Debtors are seeking authority to:  (a) prohibit their utility companies (the "Utility Companies") from altering, refusing, or discontinuing services to, or discriminating against, the Debtors; (b) deem the Utility Companies to be adequately assured of future payment; and (c) establish a procedure whereby the Utility Companies may request additional assurance.

13

39.     In the ordinary course of their business, the Debtors obtain electricity, natural gas, and/or other similar services (collectively, the "Utility Services"). On an postpetition basis, the Debtors expect to pay approximately $35,000 for Utility Services per month.

40.     The Debtors have made prepetition deposits with their Utility Companies of approximately $71,000 to provide assurance of their future payment for Utility Services. The Debtors' existing Deposits with the Utility Companies represent appropriate and adequate assurance of payment of their future obligations to the Utility Companies. In addition, the Debtors were current with all of their Utility Companies as of the Petition Date, and the proposed Budget with respect to their use of Cash Collateral on a postpetition basis includes funds set aside for the payment of ongoing Utility Services.

41.     Moreover, given that the Debtors are requesting approval of their proposed prepackaged Plan on an expedited basis through these Cases, the risk to the Utility Companies of future non-payment is minimized. Thus, the Debtors believe no additional deposits are necessary to provide the Utility Companies adequate assurance of payment. Furthermore, the proposed procedures for requests for additional assurance of payment set forth in the Utilities Motion are appropriate under the circumstances.

42.     Uninterrupted Utility Services are crucial to the Debtors' operations and the viability of their prospects for confirming the Plan. A disruption of the Utility Services would be costly to the Debtors and harmful to their businesses, forcing the Debtors from the outset of these Cases to focus on finding replacement providers for utilities, rather than accomplishing confirmation of their Plan. The Debtors believe that it is critical that Utility Services to the Debtors continue uninterrupted and that any interruption would lead to imminent and irreparable harm to the Debtors' value and business.

14

**E.** **Application for an Order Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) Authorizing the Employment and Retention of Bryan Cave LLP as Attorneys for the Debtors.**

43.     As set forth in the BCLLP Retention Application, the Debtors are seeking to retain and employ Bryan Cave LLP ("Bryan Cave") as their general bankruptcy counsel in the Cases. Bryan Cave has an extensive corporate restructuring practice and extensive experience in handling chapter 11 cases, as well as expertise in numerous other areas of practice that will be important to the Debtors' cases. In preparing for these Cases, Bryan Cave has become familiar with the Debtors' business and the legal issues that may arise in these Cases. Bryan Cave is well qualified and uniquely able to represent the Debtors in these Cases.

**F.** **Application for an Order Establishing Uniform Bar Date and Procedures for Filing Proofs of Claim and/or Proofs of Interest, and Approving the Form and Manner of Notice Thereof.**

44.     Pursuant to the Bar Date Motion, the Debtors are requesting that the Court establish a bar date for the filing of proofs of claim and proofs of interest in the Cases, approve procedures for filing of such proofs of claim and/or interest, and approve the form and manner of notice of such bar date and procedures.

45.     Setting the proposed bar dates will enable the Debtors to review, process and analyze alleged claims and interests in a timely and efficient manner in connection with the Debtors' requested confirmation of the Plan in an effort to conclude these cases quickly. Based on the notice procedures set forth in the Motion, the proposed bar dates will give all creditors and interest holders ample opportunity to prepare and file proofs of claim and/or proofs of interest.

**G.** **Scheduling Motion for Prepackaged Chapter 11 Case.**

46.     The Debtors are filing their proposed Plan and Disclosure Statement concurrently with the filing of this Declaration and the Scheduling Motion. Prior to the Petition Date, the

15

Debtors distributed the Plan and Disclosure Statement to all parties eligible to vote on the Plan and solicited their votes. All classes voting on the Plan have accepted the proposed Plan, and in fact, all creditors voting on the Plan have accepted the Plan.

47. Accordingly, as set forth in the Scheduling Motion, the Debtors are requesting that the Court set a combined hearing (the "Confirmation Hearing") to consider approval of the Disclosure Statement and related solicitation materials and the confirmation of the Plan. The Debtors propose that the Confirmation Hearing be scheduled for a date that is approximately 45 days from the Petition Date so that appropriate notice of the Confirmation Hearing may be provided to all necessary parties.

## III. ADDITIONAL INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

48. Set forth below is certain additional information required to be disclosed under Local Bankruptcy Rule 1007-2:

a. To the debtors' knowledge, no prepetition committee of creditors has been organized.

b. A list of the Debtors' 15 unsecured creditors annexed as **Exhibit B**.

c. Information regarding the Debtors' largest (and only) secured creditor is annexed as **Exhibit C**.

d. A summary of the Debtors' assets and liabilities is provided in the Debtors' schedules of assets and liabilities that are being filed contemporaneously herewith.

e. The Debtors do not have any publicly held securities.

f. The Receiver is currently in control of the Debtors' Mortgaged Property and the Debtors' cash, but the Receiver will turn over all assets in his control to the Debtors upon commencement of the Cases. Additional information regarding the Receiver and the pending Foreclosure Action is set forth above.

g. The Debtors operate the Mortgaged Property and their business at 216 West 18th Street, New York, New York and have no leased premises.

16

h. The Mortgaged Property and the Debtors' books and records are located in New York, New York.

i. The Debtors are not involved in any action or proceeding, threatened or pending, where a judgment against the Debtors or a seizure of its property may be imminent other than the Foreclosure Action discussed above.

j. I, as CRO, am the only current member of the Debtors' senior management, as set forth above and in my Employment Agreement attached as **Exhibit A**.

k. The Debtors currently have no employees.

l. The estimated amounts for payments to be made by the Debtors on a postpetition basis are set forth in detail in the Budget attached to the Cash Collateral Motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. If called to testify, I would testify as I have stated in this declaration.

DATED: November 1, 2011.

Steven A. Carlson

# EXHIBIT A

**(Steven A. Carlson Employment Agreement)**

# STEVEN A. CARLSON EMPLOYMENT AGREEMENT

This Agreement, dated as of September 22, 2011 (the "Agreement"), by and between 216 West 18 Holder LLC, 216 West 18 Mezz LLC and 216 West 18 Owner LLC ("216 West 18" or the "Company"), each a Delaware Limited Liability Company with offices at 891 Second Avenue, 22nd Floor, New York, New York 10017 and Steven A. Carlson, to serve as the Chief Restructuring Officer ("CRO") of the Company in connection with the Company's restructuring efforts as more fully set forth herein. Mr. Carlson's employment as CRO of the Company shall be solely as an independent contractor of the Company and shall not entitle Mr. Carlson to any benefits or privileges other than those specifically set forth in this Agreement.

1. Description of Engagement.

   a. Background. 216 West 18 is retaining a CRO in connection with the Company's restructuring efforts, including a possible restructuring of 216 West 18's liabilities under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The CRO will have no interest in or affiliation with 216 West 18's owners, members, or affiliates and shall serve as an independent representative of 216 West 18 in all of its restructuring efforts.

   b. Duties. The CRO shall have decision making authority on all matters related to the restructuring of 216 West 18, including all operational and financial activities, including, but not limited to the following:

   (i) Acting on behalf of the Company in connection with the Company's restructuring efforts and actively participating in the negotiation of a global settlement of 216 West 18's liabilities;

   (ii) In matters where the interests of 216 West 18 may be adverse to the interests of 216 West 18's owners, members or affiliates, the CRO will have primary responsibility, together with 216 West 18's attorneys and other professionals, for representing 216 West 18's independent interests;

   (iii) Defining attainable financial and operational goals for the Company, providing a concise plan to achieve those goals; communicating with all of the Company's constituencies, professionals, and employees on issues critical to the Company's restructuring efforts;

   (iv) Managing the Company's finances in connection with the Company's restructuring efforts; including the CRO's authorization to write checks, initiate wire transfers and otherwise make payments from the bank accounts of each of West 18 Holder LLC, 216 West 18 Mezz LLC and 216 West 18 Owner LLC to the Company's attorneys and other professionals and, in the event of a filing for relief under chapter 11 of the Bankruptcy Code, to the United States Bankruptcy Court for the Southern District of New York and the United States Trustee for Region 2;

(v)    In the event 216 West 18's restructuring efforts involve filing for relief under chapter 11 of the Bankruptcy Code, the CRO will be a representative of 216 West 18 throughout the chapter 11 restructuring efforts, including, but not limited to:

a) Seeking to assist the Company in its preparation for a potential chapter 11 proceeding including assisting in compiling all information necessary to finalize relevant pleadings to be filed with the court;

b) Negotiating and assisting in the prosecution of a chapter 11 plan of liquidation;

c) Serving as a representative of 216 West 18, including, where necessary or appropriate, testifying on behalf of 216 West 18, in connection with any judicial or similar proceedings; and

d) Performing such other tasks as may be required in connection with 216 West 18's restructuring and successful prosecution of a chapter 11 case and liquidating plan.

2.    Company Cooperation/ Reliance on Company Information

a.    The Company acknowledges and agrees that the ability of CRO to perform the services set forth above requires the full cooperation and assistance of the Company and its personnel. Accordingly, the Company covenants and agrees to furnish to CRO all information, documents and other materials reasonably requested by CRO and to make available to CRO for meetings, conference calls and otherwise all personnel designated by CRO to enable CRO to receive on a timely basis, in writing and orally, all information requested by CRO, in performance of his duties under this Agreement. The Company acknowledges and agrees that CRO, in performance of his duties under this Agreement, will be relying on the truth, completeness, accuracy and currency of the written documentation delivered and the oral communications made by the Company and its representatives to CRO and its representatives in connection with all matters related to CRO's engagement under this Agreement.

3.    Term.

a.    The Term of this Agreement, unless sooner terminated as provided in Section 5 herein, shall be from September 22, 2011 to the earlier of (i) the "Effective Date" of the Company's confirmed chapter 11 plan of liquidation (as defined therein); or (ii) at any time upon ten (10) days notice from the Company (the "Term"). This Agreement is subject to renewal or extension by mutual agreement of the parties.

4.    Compensation, Expenses.

a.    The CRO will be paid compensation of $15,000.00 per month for services rendered by the CRO in connection with this Agreement (the "Compensation"). The Compensation shall be paid in equal monthly installments, payable in advance on the twenty-second day, or the first business day as practicable thereafter, of the month in which such

services are to be performed by the CRO. The first payment made pursuant to this Agreement shall be made on September 22, 2011, or the first business day as is practicable thereafter.

b. During the Term of this Agreement, the Company shall promptly reimburse the CRO for all reasonable and necessary travel expenses and other disbursements incurred by the CRO on behalf of the Company in performance of the CRO's duties hereunder.

5. <u>Time Requirements for Engagement</u>.

a. It is understood that, during the course of the CRO's engagement, the CRO will devote his primary attention to issues related to the Company and its restructuring or any other duties as may be agreed to between the parties. While it is anticipated that his responsibilities may require significant time and attention, such engagement shall not preclude Mr. Carlson from taking on consulting or similar responsibilities with entities unrelated to the Company provided that such engagements do not interfere with the Mr. Carlson's duties under this Agreement. Prior to taking on any other engagements outside of this Agreement, Mr. Carlson shall first consult with the Company.

b. While it is not intended that Mr. Carlson's employment as CRO shall be a full time engagement requiring all or substantially all of Mr. Carlson's attention, to the extent that the duties set forth under this Agreement do require such attention thereby precluding Mr. Carlson from having adequate time to take on other engagements, the Company and Mr. Carlson shall enter into discussions to adjust Mr. Carlson's Compensation accordingly.

6. <u>Termination</u>.

a. This Agreement may be terminated by the Company upon ten (10) days written notice to Mr. Carlson, which notice shall be delivered in accordance with Section 11(g) of this Agreement. If the Company terminates this Agreement upon 10-days notice, (i) Mr. Carlson shall not be required to reimburse any Compensation already received; and (ii) if the termination date is later than the date through which the Company has already paid Mr. Carlson ("<u>Paid-thru Date</u>"), then the Company shall pay Mr. Carlson on a pro rata basis for the days from the Paid-thru date to the termination date.

b. The CRO may terminate this Agreement at any time upon thirty (30) days written notice to the Company, which notice shall be delivered in accordance with Section 11(g) of this Agreement. If the termination date is later than the Paid-thru Date, then the Company shall pay Mr. Carlson on a pro rata basis for the days from the Paid-thru date to the termination date.

c. In the event the CRO is no longer willing or able to provide the services set forth in Section 1(b) of this Agreement or this Agreement is terminated (by either party) for any reason, then upon such occurrences, this Agreement shall be deemed terminated and the Company shall be released from all obligations to the CRO with respect to this Agreement, except obligations that accrued prior to such termination and as specifically set forth herein.

7.   Conflicts

a.   CRO is not aware of any business relationship he has that creates a potential conflict of interest with the Company, based on his current knowledge of the Company. Should any potential conflict pertaining to CRO's engagement hereunder come to the attention of either party hereto, such party shall immediately advise the other. CRO reserves the right to terminate this engagement at any time if a conflict arises or becomes known to him that, in his judgment, would impair his ability to perform the services objectively. However, CRO agrees to accept no engagement after the date hereof that, at the time of engagement, could reasonably be foreseen to involve such a conflict.

8.   Disclosure of Confidential Information.

a.   The CRO recognizes that he has had and will continue to have access to non-public and confidential information regarding the Company, its owners, members, and affiliates. The CRO acknowledges that such information is of great value to the Company, is the sole property of the Company, and has been and will be acquired by the CRO in confidence in connection with fulfilling its duties under this Agreement. In consideration of the obligations undertaken by the Company herein, the CRO will not at any time, during or for ten years after the Term of this Agreement, reveal, divulge, or make known to any person, any information acquired by the CRO which is treated as confidential by the Company, unless compelled by law. The provisions of this section shall survive any termination of this Agreement, as well as the Term of this Agreement.

9.   Indemnification.

a.   The parties agree that CRO will be entitled to the benefit of the most favorable indemnities provided by the Company to its officers, directors or members, whether under the Company's formation documents or otherwise. This agreement is a supplement to and in furtherance of the indemnification provided to officers, directors and members in the Company's formation documents, including, but not limited to limited liability company agreements and operating agreements, by contract or otherwise and shall not be deemed a substitute therefore, nor to diminish or abrogate any rights of CRO thereunder.

b.   The Company hereby confirms that the CRO will be entitled to Indemnification subject to (i) Section 20 of the Limited Liability Company Agreement of 216 West 18 Owner LLC between 216 West 18 Mezz LLC and Julia A. McCullough and Victoria L. Novack (the "Owner Operating Agreement") and (ii) Section 20 of that certain Limited Liability Company Agreement of 216 West 18 Mezz LLC between 216 West 18 Holder LLC and Cheryl A. Tussie (the "Mezz Operating Agreement"). The CRO will promptly notify the Company of any actual or threatened claim arising out of or as a result of the CRO's services to the Company, but failure to do so will in no way invalidate this indemnity except to the extent the Company is prejudiced thereby. The CRO agrees that the Company shall have the right to control and direct, through counsel of its choosing, the defense or settlement of any claim, action, suit or proceeding brought by a person or entity other than the Company. The Indemnified Party may participate in such defense, but in such case the expenses of the Indemnified Party shall be paid by the

Indemnified Party provided that the Indemnified Party shall have the right to employ, at the Company's expense, one counsel of his choice to represent the Indemnified Party, if, in the written opinion of counsel to the Indemnified Party reasonably satisfactory to the Company, there exists any actual or potential conflict of interest between the Company and the Indemnified Party. The Indemnified Party shall not pay, permit to be paid, or settle any part of any claim unless the Company consents in writing to the same, and the Company shall not settle any claim or any part thereof in such way as to require any payment or action by, or restrictions on, the Indemnified Party in his own capacity unless the Indemnified Party consents in writing to the same.

10. <u>No Third Party Beneficiary</u>

a. The Company acknowledges that all advice (written or oral) provided by CRO to the Company is intended solely for the benefit and use of the Company in considering the matters to which this engagement related. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without CRO's prior written approval (which shall not be unreasonably withheld), except as required by law.

11. <u>Miscellaneous</u>

a. *Severability*. The invalidity or partial invalidity of one or more provisions of this Agreement shall not invalidate any other provision of this Agreement. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

b. *Assignments*. Neither the CRO nor the Company may assign or delegate any of their rights or duties under this Agreement without the express written consent of the other given the personal nature of the services to be carried out under this Agreement.

c. *Entire Agreement; Amendment*. This Agreement constitutes and embodies the full and complete understanding and agreement of the parties with respect to the subject matter hereof, supersedes any prior understandings and agreements, whether oral or written, between the CRO and the Company, and shall not be amended, modified or changed except by an instrument in writing executed by the CRO and an authorized officer of the Company.

d. *Waiver*. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of either party to require the performance of any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

     e.    *Binding Effect.* This Agreement shall inure to the benefit of, be biding upon and enforceable against, the parties hereto and their respective successors, heirs, beneficiaries and permitted assignees.

     f.    *Heading.* The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

     g.    *Notices.* Any and all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, sent by registered or certified mail, return receipt requested postage paid, or by private overnight mail service (*e.g.*, Federal Express) to the party at the address set forth above or to such other address as either party may hereafter give notice of in accordance with the provisions hereof. Notices shall be deemed given on the sooner of the date actually received or the third business day after sending.

     h.    *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to such State's conflicts of laws principles, except to the extent Delaware law would govern issues arising under the Owner Operating Agreement, the Mezz Operating Agreement and that certain Limited Liability Company Agreement of 216 West 18 Holder LLC between DEER 18 LLC, HAJ 18 LLC and JK 18 LLC, dated as of March 28, 2007. Each of the parties hereto irrevocably consents to the jurisdiction and venue of the federal and state courts located in the State of New York, County of New York.

     i.    *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

> **216 WEST 18 OWNER LLC,**
> **a Delaware limited liability company**
>
> By: _____
> Name:
> Title:

> **216 WEST 18 MEZZ LLC,**
> **a Delaware limited liability company**
>
> By: _____
> Name:
> Title:

> **216 WEST 18 HOLDER LLC,**
> **a Delaware limited liability company**
>
> By: _____
> Name:
> Title:

**STEVEN A. CARLSON**

_____
Steven A. Carlson

# EXHIBIT B

## (Unsecured Creditor Information)

| Name of Creditor | Mailing Address | Amount of Claim |
|---|---|---|
| Wonder Works Construction Corp. | 18 W. 21st Street, 4th Floor<br>New York, NY 10010 | $1,203,920.51 |
| 18th Street Owner LLC | c/o Atlas Capital Group LLC<br>505 Fifth Avenue<br>New York, NY 10017 | $338,154.36 |
| Gibraltar Contracting Inc. | 245 E. 137th Street<br>Bronx, NY 10451 | $268,629.00 |
| Ramapo Lighting and Electric | 32 S. Central Avenue<br>Spring Valley, NY 10977 | $187,650.00 |
| Aura Electrical Supply Inc. | 1355 60th Street<br>Brooklyn, NY 11219 | $120,000.00 |
| Eastern Air Inc. | 260 Johnson Avenue<br>Brooklyn, NY 11206 | $115,675.00 |
| Rotavele Elevator Inc. | 414 Seneca Avenue<br>Ridgewood, NY 11385 | $110,514.17 |
| Perfect Z Construction Inc. | 66-14 54th Avenue<br>Maspeth, NY 11378 | $99,923.00 |
| Grubb & Ellis New York, Inc. | 1177 Avenue of the Americas<br>New York, NY 10036 | $70,996.08 |
| Fidelity and Deposit Company of Maryland | 165 Broadway<br>New York, NY 10006 | $38,650.90 |
| Galasso Trucking & Rigging, Inc. | Two Galasso Place<br>Maspeth, NY 11378 | $17,789.00 |
| Secure Door and Hardware Inc. | 265 46th Street<br>Brooklyn, NY 11220 | $15,688.56 |
| Envirospect Inc. | 110 Lake Avenue South, Suite 31<br>Nesconset, NY 11767 | $6,262.23 |

# EXHIBIT C

## (Secured Creditor Information)

| Secured Creditor | Amount of Claim |
|---|---|
| 216 W 18 Lender LLC<br>c/o Fishman Holdings North America Inc.<br>750 3rd Ave., Suite 3101<br>New York, NY 10022 | $74,342,445.35 |