**THIS SOLICITATION IS BEING CONDUCTED, PRIOR TO THE FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, IN ORDER TO OBTAIN SUFFICIENT VOTES IN FAVOR OF A CHAPTER 11 PLAN OF LIQUIDATION TO ENABLE CONFIRMATION OF SUCH PLAN. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF THEIR CHAPTER 11 CASES, 216 WEST 18 OWNER LLC; 216 WEST 18 MEZZ LLC; AND 216 WEST 18 HOLDER LLC EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT, AS WELL AS THE SOLICITATION OF VOTES, AND CONFIRMING THE PREPACKAGED PLAN OF LIQUIDATION DESCRIBED HEREIN.**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In re: | :    Chapter 11 Case No. |
| | : |
| 216 West 18 Owner LLC, *et al.*, | :    [         ] |
| | : |
|        Debtors. | :    (Jointly Administered) |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DISCLOSURE STATEMENT FOR THE DEBTORS'
PREPACKAGED LIQUIDATING CHAPTER 11 PLAN**

BRYAN CAVE LLP
Lloyd A. Palans (LP-8572)
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

*Attorneys for Debtors*
Dated: September 26, 2011

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION AND SUMMARY.................................................................4
     A.   Disclosure Statement Enclosures.....................................................4
     B.   Only Impaired Classes Vote ...........................................................5
     C.   Confirmation Hearing ....................................................................6

II.  OVERVIEW OF THE PLAN ................................................................6
     A.   Introduction.................................................................................6
     B.   Summary of Distributions..............................................................6

III. OVERVIEW OF CHAPTER 11 ...........................................................7

IV.  BACKGROUND ....................................................................................7
     A.   The Debtors.................................................................................7
     B.   The Mortgage Loan......................................................................8
     C.   The Mezzanine Loan....................................................................8
     D.   Events Leading to Chapter 11 Filing ..............................................9
     E.   Decision to Pursue Chapter 11 Filing .............................................9
     F.   Loan Purchase Agreement and Related Transaction .......................10
     G.   Mechanic Lienor Plan Support Agreements ...................................11

V.   SOLICITATION.................................................................................12

VI   ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES...............12
     A.   First-Day Motions......................................................................13
     B.   Committee Process......................................................................14

VII. SUMMARY OF PLAN PROVISIONS ..............................................14
     A.   Introduction...............................................................................14
     B.   Method of Classification of Claims and Interests and General
          Provisions..................................................................................14
     C.   Unclassified Administrative Claims, Priority Tax Claim, and Fee
          Claims .......................................................................................15
     D.   Classification and Treatment of Claims and Interests ......................15
     E.   Means For Implementation Of The Plan ........................................17
     F.   Distributions Under the Plan........................................................18
     G.   Treatment Of Executory Contracts and Unexpired Leases................21
     H.   Conditions to Confirmation and Effective Date ..............................22
     I.   Retention of Jurisdiction .............................................................23
     J.   Miscellaneous Provisions.............................................................24

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................29
     A.   Taxation ....................................................................................29
     B.   Distributions to Holders of Claims ...............................................30

C.   Objections to Classification ...................................................30

D.   Certain Bankruptcy Law Considerations ...............................30

**IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN 31**

A.   Liquidation Under Chapter 7 ...............................................31

B.   Alternative Plan of Reorganization .....................................31

**X.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN............31**

A.   Federal Income Tax Consequences in General.....................31

B.   Federal Income Tax Consequences to the Debtors................32

C.   Federal Income Tax Consequences to Holders of Allowed Claims in Class 2 and 3 ...................................................................33

D.   Importance of Obtaining Professional Tax Assistance..........34

**CONCLUSION** ...............................................................................35

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED IN CONJUNCTION WITH THE DEBTORS' PREPACKAGED LIQUIDATING CHAPTER 11 PLAN (THE "PLAN")[1] THAT WILL BE FILED WITH THE DEBTORS' CHAPTER 11 PETITIONS. THE DEBTORS UTILIZED THIS DISCLOSURE STATEMENT TO SOLICIT THE VOTES OF THE TWO CLASSES THAT ARE IMPAIRED UNDER THE PLAN THAT ARE ENTITLED TO VOTE. THE TWO IMPAIRED CLASSES (THE MORTGAGE LENDER CLAIM AND THE OWNER GENERAL UNSECURED CLAIMS) ARE ANTICIPATED TO VOTE TO ACCEPT THE PLAN PRIOR TO THE COMMENCEMENT OF THE CASES. THE PLAN WILL PROVIDE FOR, INTER ALIA, (I) ON ACCOUNT OF THE MORTGAGE LENDER CLAIM, THE TRANSFER OF 216 WEST 18th STREET, NEW YORK, NEW YORK TO A NEWLY FORMED SPECIAL PURPOSE ENTITY DESIGNATED BY THE MORTGAGE LENDER; (II) DISTRIBUTIONS ON ACCOUNT OF UNSECURED CLAIMS AGAINST OWNER IN THE AMOUNT OF 19.6%; AND (III) THE CANCELATION OF EXISTING EQUITY OF THE DEBTORS.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS AND INTEREST HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," ARTICLE VIII.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I of the Plan.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THEIR BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES, HAS BEEN PREPARED AND OBTAINED BY THE DEBTORS AND THEIR PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTORS. NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE "SUMMARY OF PLAN PROVISIONS,"

ARTICLE VII. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

# I. INTRODUCTION AND SUMMARY

216 West 18 Owner LLC; 216 West 18 Mezz LLC; and 216 West 18 Holder LLC (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") and applicable non-bankruptcy law, to holders of Claims against and Equity Interests in the Debtors in connection with the pre-petition solicitation of acceptances of the Debtors' Prepackaged Liquidating Chapter 11 Plan, dated September 26, 2011, and as such plan may be amended (the "Plan"), to be filed by the Debtors with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and projected financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, significant events that should occur in the Debtors' chapter 11 cases and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

## A. *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A)

- Liquidation Analysis (Exhibit B)

- Plan Support Agreement between and among the Debtors, Harry Jeremias, and the Mortgage Lender Designee, dated as of September 9, 2011 (Exhibit C)

- Plan Support Agreement between Aura Electrical Supply Inc. and the Debtors, dated as of September 22, 2011 (Exhibit D)

- Plan Support Agreement between Eastern Air, Inc. and the Debtors, dated as of September 8, 2011 (Exhibit E)

- Plan Support Agreement between Ramapo Lighting and Electric and the Debtors, dated as of September 8, 2011 (Exhibit F)

- Plan Support Agreement between Rotavele Elevator, Inc. and the Debtors, dated as of September 8, 2011 (Exhibit G)

- Plan Support Agreement between Secure Door and Hardware Inc. and the Debtors, dated as of September 8, 2011 (Exhibit H)

- Plan Support Agreement between Wonder Works Construction Corp. and the Debtors, dated as of September 8, 2011 (<u>Exhibit I</u>)

In addition, a Ballot (as defined in Article V herein) for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Impaired Claims and Equity Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

Detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.

## B.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and would not be entitled to vote.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

In addition, if any Impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under the cram-down provisions of section 1129(b) of the Bankruptcy Code.

Under the Plan, Claims in Class 1 are unimpaired, and the holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Under the Plan, Claims in Classes 4 and 5, and Equity Interests in Class 6, will not receive any distribution of any kind on account of their claims or equity interests, and the holders of Class 4 and 5 Claims and Class 6 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Under the Plan, Claims in Classes 2 and 3 are Impaired and are entitled to vote on the Plan. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN WAS PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 2 and 3. The Debtors commenced the solicitation process for the

Plan prior to the Petition Date and anticipate receiving ballots indicating the acceptance of the Plan from Classes 2 and 3 prior to the Petition Date and prior to the deadline of October 26, 2011 for returning all ballots.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of the Plan," Article II, below.

## C.  Confirmation Hearing

The Debtors may commence chapter 11 cases in the Bankruptcy Court after this solicitation, but have not yet done so. Accordingly, neither the Disclosure Statement nor the Plan has been approved by any court.

If the Debtors commence chapter 11 cases in the Bankruptcy Court based on the Plan, the Bankruptcy Court will schedule a Confirmation Hearing and direct that objections, if any, to confirmation of the Plan be served and filed on or before a date certain. The Debtors will provide notice of the date of the Confirmation Hearing and objection deadline in accordance with the Bankruptcy Code, Bankruptcy Rules, and orders of the Bankruptcy Court. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

## II.  OVERVIEW OF THE PLAN

## A.  Introduction

The Plan is the product of the effort by the Debtors' management and their professional advisors to develop a plan that will enable Creditors to receive the maximum recovery possible in this case with the consent of the Impaired Classes.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND EQUITY INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND EQUITY INTEREST HOLDERS. THE DEBTORS THEREFORE URGE THOSE PARTIES ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

## B.  Summary of Distributions

Under the Plan, Claims against and Equity Interests in the Debtors are divided into Classes and will receive the distributions and recoveries (if any) described in the table below. The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.

| Class | Type of Claim or Membership Interest | Estimated Amount of Allowed Claims | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|
| N/A | Administrative Claims | $0 | 100% | No |
| N/A | Priority Tax Claims | $0 | 100% | No |
| N/A | Fee Claims | To be determined | 100% | No |
| 1 | Other Priority Claims | $0 | 100% | No |
| 2 | Mortgage Lender Claim | $73,518,067.26[2] | 84.33% | Yes |
| 3 | Owner General Unsecured Claims | $2,611,491.31 | 19.6% | Yes |
| 4 | Other General Unsecured Claims | $80,000.00 | 0% | No |
| 5 | Mezzanine Loan Claim | $24,632,345.08 | 0% | No |
| 6 | Equity Interests | N/A | 0% | No |

## III. OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders. A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

A plan and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan may be disseminated to the holders of claims against or interests in a debtor in connection with the solicitation of their vote to accept or reject the plan under certain circumstances.

## IV. BACKGROUND

### A. The Debtors

Debtor 216 West 18 Owner LLC ("Owner") is a Delaware limited liability company wholly owned by Debtor 216 West 18 Mezz LLC ("Mezz"). Mezz is wholly owned by Debtor 216 West 18 Holder LLC ("Holder"). Holder is a Delaware limited liability company, owned

---

[2] Plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date.

94.2% by HAJ 18 LLC ("HAJ 18") and 5.8% by JK 18 LLC. HAJ 18, wholly owned by Harry Jeremias ("Jeremias"), is the managing member of Holder. The Debtors do not have any employees.

## B.    *The Mortgage Loan*

On April 17, 2007, Owner entered into three loan agreements (the "Mortgage Loans") with Bank of America, NA (the "Bank") for the purpose of financing the acquisition and development of, and construction on, the Mortgaged Property located at 216 West 18th Street, New York, NY. In connection with these loan agreements, Owner executed and delivered to the Bank, as obligee, three promissory notes: one in the amount of $27,763,992.82 (the "Acquisition Loan Note"); one in the amount of $10,287,500.00 (the "Building Loan Note"); and one in the amount of $9,948,507.18 (the "Project Loan Note"). Each of the notes was secured by a mortgage on the Mortgaged Property (the Acquisition Loan Mortgage, the Building Loan Mortgage, and the Project Loan Mortgage, respectively), which was executed by Owner and delivered to Mortgage Electronic Registration Systems, Inc. ("MERS"), as mortgagee and nominee for the Bank. Each of the mortgages was duly recorded and perfected.

From the closing of the Mortgage Loans through July 22, 2009, the Bank disbursed $48,000,000 to fund the Mortgage Loans. On November 17, 2010, 216 W 18 Lender LLC (the "Mortgage Lender"), an affiliate of Fishman Holdings North America Inc., purchased the Mortgage Loan from the Bank. The total amount outstanding under the Mortgage Loans, including the principal amount of $48,000,000 plus interest, costs, fees, penalties and expenses is approximately $73,518,067.26 in the aggregate as of September 15, 2011. Based on a preliminary appraisal completed prior to solicitation, the value of the Mortgaged Property is $62,300,000.00.

## C.    *The Mezzanine Loan*

Pursuant to that certain mezzanine loan agreement dated as of April 17, 2007 by and between the Bank ("Original Mezz Lender"), as lender, and Mezz, as borrower, (as may be further modified or amended from time to time, the "Mezzanine Loan Agreement"), Original Mezz Lender originated the Mezzanine Loan in the original principal amount of $19,560,000 to Mezz. The Mezzanine Loan is secured by the equity in Owner.

Pursuant to that certain memorandum of sale dated as of June 15, 2007 by and between Original Mezz Lender, as seller, and ING Clarion Debt Opportunity Fund II Mezzanine Sub LLC, as purchaser ("Initial Mezz Purchaser"), Original Mezz Lender sold, transferred and assigned to Initial Mezz Purchaser all of Original Mezz Lender's right, title and interest in and to the Mezzanine Loan. Pursuant to that certain memorandum of sale dated as of September 1, 2010 by and between Torchlight Debt Opportunity Fund II Mezzanine Sub, LLC (f/k/a ING Clarion Debt Opportunity Fund II Mezzanine Sub LLC), as seller ("Initial Mezz Seller"), and the Bank, as purchaser, Initial Mezz Seller sold, transferred and assigned to the Bank all of Initial Seller's right, title and interest in and to the Mezzanine Loan.

On November 17, 2010, the Mortgage Lender purchased the Mezzanine Loan from the Bank. As of September 14, 2011, the total amount outstanding under the Mezzanine Loan,

including the principal amount of $19,560,000 plus interest, costs, fees, penalties and expenses aggregate approximately $24,632,345.

**D.  Events Leading to Chapter 11 Filing**

The Debtors acquired the Mortgaged Property at a premium in 2007, at the height of the New York real estate market and mere months before the economic crisis of 2008. The Debtors' business plan was highly speculative in that it provided for a complete rehabilitation of the Mortgaged Property, which required a substantial capital investment and precluded any rental income during the renovations. The scheduled improvements on the Mortgaged Property were repeatedly delayed, which impeded the Debtors' ability to enter into lease agreements and generate revenue. Concurrently therewith, the market for leased commercial space slowed dramatically, and the Debtors were unable to obtain rental income as a result, leaving the Debtors heavily leveraged. The financial crisis eviscerated the re-finance market, such that the Debtors were left with very few options. The project was unattractive to the few capital sources that were available during the financial crisis due to the lack of signed leases and the incomplete renovations. As a result, the Debtors ran out of money and were unable to service the debt.

On October 22, 2009, MERS, as nominee for the Bank, commenced a foreclosure action of the Mortgage in the Supreme Court of the State of New York, County of New York (Index No. 650622/2009 E, the "Foreclosure Action"). On that same date, MERS filed an application seeking the appointment of a temporary receiver. By order (the "Order Appointing a Receiver") dated November 18, 2009, the Honorable Bernard J. Fried, of the Supreme Court of the State of New York (the "New York Supreme Court"), appointed Andrew L. Herz as the temporary receiver ("Receiver") of the Mortgaged Property. Pursuant to the Order Appointing a Receiver and subject to the terms thereof, the Court granted the Receiver the power and authority to, among other things, complete construction at the Mortgaged Property and to enter into certain leases for space at the Mortgaged Property. The Foreclosure Action is pending before the New York Supreme Court.

On December 30, 2010, Mortgage Lender filed a complaint against Jeremias and Tsvi Pluczenik ("Pluczenik") in the New York Supreme Court, seeking to recover certain amounts expended to complete the renovation of the Mortgaged Property pursuant to that certain Completion Guaranty executed by Jeremias and Pluczenik (Index No. 652415/2010 E, the "Completion Guaranty Action"). The Completion Guaranty Action is pending before the New York Supreme Court.

**E.  Decision to Pursue Chapter 11 Filing**

In August 2011, Atlas Capital Group LLC ("Atlas") proposed to the Debtors a prepackaged consensual chapter 11 plan of liquidation that would resolve the various disputes between the parties and provide a recovery for Mechanic Lienors (as defined in Article IV § G herein) and any other unsecured creditors with valid Claims against Owner. Absent the proposed plan of liquidation, the Debtors' creditors, other than the Mortgage Lender, would receive no recovery because substantially all the Debtors' assets are secured by the Mortgage, and the Mortgage is undersecured.

Upon careful consideration of other alternatives, the Debtors determined that a prepackaged chapter 11 liquidating plan is in the best interests of the Debtors' creditors and other stakeholders. The Plan provides the Debtors and the Debtors' stakeholders with the unique opportunity to resolve the Foreclosure Action and the Completion Guaranty Action, and provides a distribution to the Debtors' other creditors who would otherwise receive nothing in a foreclosure or other liquidation. The Plan will provide for, inter alia, (i) the transfer of the Mortgaged Property to the Mortgage Lender Designee, an affiliate of Atlas; (ii) distributions on account of unsecured claims against the Owner in the amount of 19.6%; and (iii) the cancellation of existing equity of the Debtors. The Plan will also effectuate the LPA (discussed in detail below), wherein the Mortgage Lender Designee will purchase the Loan from the Mortgage Lender for $62,000,000.

In connection with their decision to pursue their potential chapter 11 filings, the Debtors retained Steven A. Carlson as Chief Restructuring Officer of the Debtors to, among other things, direct and oversee the restructuring process. The Debtors also retained Bryan Cave LLP as counsel to assist and advise them in their restructuring process and their potential chapter 11 cases.

### F. Loan Purchase Agreement and Related Transaction

In the LPA, the Mortgage Lender Designee agreed to purchase, and the Mortgage Lender agreed to sell, the Mortgage Loan and the Mezzanine Loan, upon the earlier to occur of (i) the Effective Date of the Plan; (ii) 150 days following execution of the LPA,[3] (iii) the date upon which the Mortgaged Property is transferred by foreclosure or deed in lieu thereof; or (iv) such earlier date as may be designated by the Mortgage Lender Designee upon five (5) days written notice or otherwise agreed to by the Mortgage Lender and the Mortgage Lender Designee.

In connection with the LPA, the Mortgage Lender Designee, Owner, Mezz Debtor, Holder, Jeremias, and HAJ 18 entered into an agreement (the "HJ Plan Support Agreement"), pursuant to which the parties thereto agreed to, *inter alia*:

- use their respective good faith, diligent and best efforts to promote, support and cause the solicitation of the Plan, and, the preparation and at Mortgage Lender Designee's election, filing of the Chapter 11 Cases, and, unless instructed otherwise by Mortgage Lender Designee in writing, to promote, support and cause the confirmation and consummation of the Plan;

- not support any party adverse to the Bank, the Mortgage Lender, or the Mortgage Lender Designee in the Foreclosure Action or the Completion Guaranty Action;

- if Mortgage Lender Designee determines, in its sole discretion, not to pursue confirmation of the Plan, and in lieu thereof, determines to acquire the Mortgaged Property by foreclosure or deed in lieu, then Jeremias, HAJ 18, and each of the

---

[3] Simultaneously with execution of the LPA, the Mortgage Lender Designee delivered to an escrow agent a non-refundable, initial deposit in the amount of $2,000,000. By no later than October 10, 2011 (the "Due Diligence Expiration Date"), the Mortgage Lender Designee is required to terminate the LPA or deliver a second deposit in the amount of $10,400,000 (the "Second Deposit").

Debtors shall and shall cause their affiliates and agents to use good faith, diligent and best efforts to support an orderly transfer of the Mortgaged Property to Mortgage Lender Designee and shall not raise any defenses or impediments to same.

- if the Mortgage Lender Designee delivers the Second Deposit, then, in connection with the Plan, Jeremias and the Mortgage Lender Designee will appoint a chief restructuring officer for the Debtors;

- HAJ 18 has the right (the "Co-Investment Right") under the HJ Plan Support Agreement to invest in the managing member of the single member (the "Sole Member") of Mortgage Lender Designee (such entity, the "Managing Member") on the Effective Date, should it occur. The Managing Member, an affiliate of Atlas, holds 20% of the interests in the Sole Member. In that regard, should HAJ 18 elect to exercise the Co-Investment Right, it will be required to make a contribution (the "Initial Contribution") to Managing Member on the Effective Date equal to (i) 33.333% of all capital contributed to Sole Member by the Managing Member on or prior to the Effective Date minus (ii) $350,000;

- Provided that HAJ 18 makes the Initial Contribution on the Effective Date: (i) HAJ 18 will be entitled to receive distributions of all amounts subsequently distributed by the Managing Member to its members on a pari passu basis; (and (ii) once all direct and indirect investors in Mortgage Lender Designee (other than HAJ 18) have achieved a 20% IRR, HAJ 18 will be entitled to a special distribution of $500,000 to the extent the Mortgage Property generates sufficient net cash flow before any further distributions to any of the other investor;

- the HJ Plan Support Agreement shall terminate in the event of the termination of the LPA prior to the Due Diligence Expiration Date; and

- the HJ Plan Support Agreement provides that nothing in that agreement shall require Jeremias or HAJ 18 to breach any fiduciary duties they have to creditors in connection with the Plan.

## G. *Mechanic Lienor Plan Support Agreements*

Several entities (the "Mechanic Lienors") have filed mechanic's liens against the Mortgaged Property. However, irrespective of the validity of the liens and/or the Claims of the Mechanic Lienors, the Mortgage is superior to any mechanic's liens. Further, because the Mortgage Loan is undersecured, none of the Mechanic Lienors have any interest in the Mortgaged Property. To the extent a Mechanic Lienor holds a valid Claim against a Debtor, such Claim is an unsecured Claim. Accordingly, for the purposes of the Plan, Claims of Mechanic Lienors are included with, and classified as, unsecured Claims.

On or about September 8, 2011, Mortgage Lender Designee entered into separate substantially similar plan support agreements with five (5) Mechanic Lienors (the "Plan Support Lienors"), pursuant to which each of such Mechanic Lienors agreed to support the Plan which,

*inter alia*, provides for a 19.6% distribution for holders, including Mechanic Lienors, of Unsecured Claims against Owner. As noted above, absent the Plan, such creditors would otherwise receive nothing in a foreclosure or other liquidation. In addition to the Plan Support Lienors, another Mechanic Lienor (together with the Plan Support Lienors, the "Supporting Lienors") has agreed to assign its Claim to an affiliate of Atlas. The Claims of the Supporting Lienors aggregate approximately $2,000,000 out of a total of less than $2,600,000 of mechanic's liens filed against the Mortgaged Property.

## V.     SOLICITATION

The Debtors will commence solicitation of votes on the Plan on September 26, 2011 by serving (via overnight FedEx delivery) the solicitation packages as described below. The Debtors will solicit the votes of only (i) holders of the Mortgage Lender Claim (Class 2), either directly or through their attorneys, and (ii) holders of Owner General Unsecured Claims (Class 3). No other parties in interest are entitled to vote on the Plan, as all other parties in interest are Unimpaired or are deemed to reject the Plan. The Debtors will file vote certifications (the "Vote Certifications") certifying acceptances from the creditors entitled to vote and who actually vote. In addition, and out of an abundance of caution, the Debtors are publishing a notice regarding their proposed Plan in the New York Times and New York Post in an effort to notify any unknown creditors about the Plan and the deadline for submitting votes.

The Debtors will send solicitation packages directly to the holders of Class 3 Owner Unsecured Claims (the "Solicitation Package") that shall include:

(a)     the Disclosure Statement;

(b)     an individual ballot for voting a Class 3 Claim (the "Ballot");

(c)     a preaddressed return envelope;

(d)     a letter from the Debtors with a recommendation urging claimants to vote to accept the Plan; and

(e)     a cover letter describing the contents of the solicitation package.

As clearly stated on the Ballots, in order to be counted, completed ballots must be received by the Debtors by 5:00 p.m., Eastern Standard Time, on October 26, 2011 (the "Voting Deadline"). Accordingly, claimants and their counsel will be given thirty (30) days from the mailing of the Disclosure Statement to vote.

The Debtors believe that they will solicit votes on their Plan from substantially all holders of Owner Unsecured Claims in Class 3 by their distribution of the Solicitation Packages. The Debtors do not believe there is need for any further solicitation of votes on the Plan.

## VI.     ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

If the Debtors receive the requisite acceptances in response to the Solicitation, the Debtors intend to promptly commence Chapter 11 Cases and seek to expeditiously confirm their

chapter 11 plan; <u>provided</u> that the Debtors reserve the right not to file such a case. From and after the Petition Date, the Debtors will continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not anticipate protracted Chapter 11 Cases. To expedite their liquidation under chapter 11, the Debtors intend to seek, among other things, the relief detailed below from the Bankruptcy Court on the Petition Date. If granted, this relief will facilitate the administration of the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. Bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of a chapter 11 case. The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their liquidation and equitable distribution off their assets, including the matters described below.

## A. *First-Day Motions*

- *Case Administration.* These motions will seek Bankruptcy Court authorization to: (i) establish interim compensation procedures for professionals; (ii) retain ordinary course professionals; and (iii) approve notice procedures.

- *Business Operations.* These motions will seek Bankruptcy Court authorization to: (i) maintain the Debtors' existing bank accounts and operate their cash management system substantially as it existed prior to the Petition Date; and (ii) provide adequate assurance to utility companies and establish procedures for determining requests for additional adequate assurance.

- *Financing.* The Debtors will also file a motion to seek Bankruptcy Court approval for use of "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code), to provide adequate protection for same, and to obtain post-petition financing with super-priority and senior secured status, to the extent the Debtors determine such financing is necessary.

- *Scheduling.* The Debtors will file a motion seeking entry of an order (i) scheduling the Confirmation Hearing and to approve the adequacy of the information contained in the Solicitation and Disclosure Statement and the Prepetition Solicitation Procedures and consider confirmation of the Plan; (ii) establishing deadlines and procedures for filing objections to approval of the Solicitation and Disclosure Statement, the Prepetition Solicitation Procedures or confirmation of the Plan; and (iii) approving the form and manner of notice of the commencement of the Chapter 11 Cases and the scheduling of the Confirmation Hearing.

- *Deadline to File Proofs of Claim.* The Debtors will request that the Bankruptcy Court enter an order (the "<u>Bar Date Order</u>") generally requiring any Person holding or asserting a Claim against the Debtors to file a written proof of claim with the Debtors, on or before a date certain.

**B.   Committee Process**

Subsequent to the Petition Date, the Office of the United States Trustee may solicit the Debtors' creditors to determine whether there is an interest from the same in forming an Official Committee of Unsecured Creditors under 11 U.S.C. §1102. The Debtors believe that they may be advised by the Office of the United States Trustee that a Committee of Unsecured Creditors will not be formed due to insufficient interest on the part of the Debtors' creditors but no guarantee can be made that such a committee will not be formed.

## VII.   SUMMARY OF PLAN PROVISIONS

**A.   Introduction**

The Plan is the product of diligent efforts by the Debtors to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law. The preliminary valuation obtained by the Debtors reflects an aggregate value for the Property of $62,300,000. The outstanding amount of the Mortgage Lender Claim as of the date hereof is approximately $73,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date, *i.e.*, significantly greater than the value of the Mortgaged Property.

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' Creditors and Equity Interest holders. The Debtors believe, and will demonstrate to the Bankruptcy Court, that the Debtors' creditors will receive significantly more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

**B.   Method of Classification of Claims and Interests and General Provisions**

1.   General Rules of Classification

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2.   Bar Date for Administrative Claims

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Debtors, and their counsel, no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and

enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Debtors and their counsel, and the party requesting payment of an Administrative Claim within thirty (30) days after the filing of such request for payment. All post-Petition Date ordinary course administrative claims shall be paid in the ordinary course during the Chapter 11 Case.

### 3. Bar Date for Fee Claims

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date must be filed and served on the Debtors and their counsel no later than twenty (20) days after the Effective Date (the "Fee Claim Bar Date").

### C. Unclassified Administrative Claims, Priority Tax Claim, and Fee Claims

Administrative Claims, Priority Tax Claims and Fee Claims are not classified in the Plan. The treatment of and consideration to be received by holders of Allowed Administrative Claims, Priority Tax Claims and Fee Claims shall be in full and complete satisfaction, settlement, release and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative Claims, Priority Tax Claims and Fee Claims shall be satisfied in accordance with the terms of the Plan.

1. _Administrative Claims_ Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Administrative Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Administrative Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Administrative Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim, the Debtors, and the Mortgage Lender Designee might otherwise agree. Notwithstanding the foregoing, the Statutory Fees shall be paid in Cash as soon as practicable after the Effective Date.

2. _Priority Tax Claims_ Except as provided otherwise in the Plan, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim the full amount thereof, without post-Petition Date interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim, the Debtors, and the Mortgage Lender Designee.

3. _Fee Claims_ Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash after such Fee Claim becomes an Allowed Claim.

### D. Classification and Treatment of Claims and Interests

1. _Class 1 Other Priority Claims_ Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Other Priority Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such

Claim becomes an Allowed Other Priority Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Other Priority Claim, the Debtors, and the Mortgage Lender Designee or (b) such lesser amount as the holder of such Allowed Other Priority Claim, the Debtors, and the Mortgage Lender Designee might otherwise agree. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote and is conclusively presumed to accept the Plan.

2.    Class 2 Mortgage Lender Claim    Mortgage Lender shall have an Allowed Secured Claim in respect of the Mortgage Loan in the amount of $73,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date (the "Mortgage Lender Allowed Secured Claim"). The Mortgage Lender has agreed that solely in connection with the confirmation of the Plan, the Mortgage Lender Allowed Secured Claims shall be reduced to the total amount of $62,000,000.00 (the "Reduced Mortgage Lender Allowed Secured Claim"). On the Effective Date, in full and complete satisfaction of the Reduced Mortgage Lender Allowed Secured Claim, Owner shall transfer and convey (the "Property Transfer") to the Mortgage Lender Designee all the Property, free and clear of all Claims, Liens, charges, interests and encumbrances other than the Mortgage and any other Liens, charges, interests, and/or encumbrances under the Mortgage Loan Documents; provided, however, that the Owner shall retain, and not transfer to Mortgage Lender Designee on the Effective Date (i) Cash needed to make other payments on the Effective Date pursuant to the terms of the Plan; (ii) the Administrative Claims Reserve; (iii) the Class 3 Disputed Claims Reserve; and (iv) sufficient Cash reserve to pay Statutory Fees; provided, further, that (x) following resolution and payment of the Claims provided for by the Administrative Claims Reserve, the Debtors, in accordance with section 7.3 of the Plan, shall transfer promptly to the Mortgage Lender Designee any balance remaining in the Administrative Claims Reserve and (y) following resolution and payment of the Claims provided for by the Class 3 Disputed Claims Reserve, the Debtors, in accordance with section 7.4 of the Plan, shall transfer promptly to the Mortgage Lender Designee any balance remaining in the Class 3 Disputed Claims Reserve. The balance of the Mortgage Lender Claim in the amount of approximately $11,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date (the "Mortgage Lender Allowed Deficiency Claim"), solely in connection with the Confirmation and Effective Date of the Plan, shall be deemed waived and extinguished on the Effective Date. Mortgage Lender reserves the right to assert and vote the Mortgage Lender Allowed Deficiency Claim as a Class 3 Claim but only in the event the Debtors amend the Plan and/or seeks to utilize the cram-down provisions of Section 1129(b) as to Class 3 Owner General Unsecured Claims. Mortgage Lender is impaired and therefore, is entitled to vote. Nothing contained in this section or the Plan shall have the effect or be deemed to have the effect of discharging or terminating the Mortgage, the Mortgage Loan, or any other Mortgage Loan Documents, provided, however; that upon the occurrence of the Property Transfer, any and all obligations of the Debtors under the Mortgage, the Mortgage Loan, and any other Mortgage Loan Documents shall be deemed waived, extinguished, and discharged. In addition to the transfers set forth above, as a condition to the Effective Date of the Plan and contemporaneous with such Effective Date unless Mortgage Lender Designee has previously paid Mortgage Lender $62,000,000 in aggregate consideration, the Mortgage Lender Designee shall close on the LPA by, *inter alia*, paying Mortgage Lender $62,000,000 in aggregate consideration.

3. _Class 3 Owner General Unsecured Claims_  Class 3 shall consist of General Unsecured Claims against Owner other than the Mortgage Lender Deficiency Claim. Each holder of a General Unsecured Claim shall receive Cash on the Effective Date or as soon as practicable thereafter in the amount of 19.6% of its Allowed Claim (without interest). The holders of Claims in this Class are impaired and therefore entitled to vote on the Plan.

4. _Class 4 Other General Unsecured Claims_  Class 4 shall consist of all General Unsecured Claims against Mezz Debtor and Holder. Specifically, the Class 4 Other General Unsecured Claim in the amount of $80,000.00 referenced in the chart above represents a loan made by 18th Street Owner LLC, an affiliate of Atlas Capital Group LLC, to Holder. Holders of Allowed Class 4 Claims will not receive any distribution of any kind under the Plan on account of their Allowed Other General Unsecured Claims. The holders of Claims in this Class are impaired and are deemed to reject the Plan.

5. _Class 5 Mezzanine Loan Claim_  Class 5 shall consist of the Claim of the Mezzanine Lender against the Mezz Debtor in connection with the Mezzanine Loan. The Mezzanine Lender will not receive any distribution of any kind under the Plan on account of the Mezzanine Loan. The holders of Claims in this Class are impaired and are deemed to reject the Plan.

6. _Class 6 Equity Interests_  Class 6 shall consist of all Equity Interests. On the Effective Date, Class 6 Equity Interests shall be deemed cancelled, null and void and of no force and effect. Holders of Allowed Equity Interests will not receive any distribution of any kind under the Plan on account of Allowed Equity Interests, and are deemed to reject the Plan.

7. _Reservation of Rights_  Nothing contained in the Plan shall be deemed to limit the right of the Debtors, the Mortgage Lender Designee, or the United States Trustee to object to any Administrative Claims (including without limitation Fee Claims and Cure Amounts), Priority Claims, Other Priority Claims, General Unsecured Claims (including without limitation Claims for rejection damages under Section 365 of the Bankruptcy Code) and Secured Claims filed in the Chapter 11 Cases other than the Mortgage Lender Claim which is deemed Allowed and not subject to objection. Nothing contained in the Plan shall affect the Debtors' rights and defenses both legal and equitable, with respect to all members of any Unimpaired Classes including but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against members of any Unimpaired Classes subject to the releases granted in the Plan.

## E.  _Means For Implementation Of The Plan_

1. _Corporate Action_

Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders and/or members, or the Debtors' boards of directors, managers, and/or managing members. As soon as practicable following the Effective Date, each of the Debtors shall dissolve or otherwise terminate its existence, by filing a certificate of dissolution and a copy of the Confirmation Order and any other necessary documents with applicable state authority.

2.    **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration provided by each of the Released Parties, on the Effective Date and effective as of the Effective Date, the Released Parties are deemed released and discharged under the Plan by the Debtors and their Estates from any and all direct, indirect or derivative claims, obligations, rights, suits, judgments, Liens, damages, causes of action, remedies, liabilities, claims or rights of contribution and indemnification, and all other claims, causes of action, controversies of every type, kind, nature, description or character whatsoever, including any derivative claims asserted on behalf of the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, at equity, whether for tort, fraud, contract or otherwise, that the Debtors would have been legally entitled to assert, including, but not limited to, any claim or cause of action arising from or relating to the Debtors, the Chapter 11 Cases, the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest of the Released Parties that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place, in each case to the extent incurred on or prior to the Effective Date, other than in each case claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

3.    **Injunction**

On the Effective Date, the Debtors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, including asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted by the Debtors and their Estates to the Released Parties pursuant to the Plan. The Confirmation Order shall specifically provide for such injunction.

The releases and injunctions granted in favor of the Released Parties are integral parts of the Plan and are necessary to confirm the Plan.

F.    *Distributions Under the Plan*

1.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than

a Business Day shall be made on the next succeeding Business Day. The Debtors shall make all distributions required to be made under the Plan. As a condition to the Effective Date of the Plan and contemporaneous with such Effective Date unless Mortgage Lender Designee has previously paid Mortgage Lender $62,000,000 in aggregate consideration, the Mortgage Lender Designee shall close on the LPA by, inter alia, paying Mortgage Lender $62,000,000 in aggregate consideration.

2.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors have been notified in writing of a change of address, including by the filing of a proof of claim or Administrative Claim request that contains an address for a holder of a Claim different from the address for such holder reflected on any Schedule.

3.    Reserves for Administrative, Priority Tax and Other Priority Claims

On or before the Effective Date, the Debtors shall establish and maintain a reserve in an amount equal to the sum of (i) all Disputed Administrative Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Other Priority Claims, if any, in an amount equal to what would be distributed to holders of Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, and Disputed Cure Amounts if their Disputed Claims have been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Debtors and/or the Mortgage Lender Designee and (ii) an estimated amount for unpaid Fee Claims and any other Administrative Claims that have not been filed as of the Effective Date, such amount to be agreed upon by the Debtors and the Mortgage Lender Designee or such other amount as may be fixed by the Bankruptcy Court (together, the "Administrative Claims Reserve"). With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Fee Claims, Disputed Administrative Claims, Disputed Cure Amounts, Disputed Priority Tax Claims, and Disputed Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed promptly to the Mortgage Lender Designee (and not to the Debtors). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties (including the Mortgage Lender Designee).

4.    Reserves for Disputed Claims

On or before the Effective Date, the Debtors shall establish and maintain a reserve ("Class 3 Disputed Claims Reserve") for all Class 3 Disputed Claims, including any Disputed Rejection Damage Claims. For purposes of establishing a reserve for Class 3 Disputed Claims, Cash will be set aside in an amount equal to the amount that would have been distributed to the holders of Class 3 Disputed Claims had their Class 3 Disputed Claims been deemed Allowed

Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Debtors and/or the Mortgage Lender Designee. With respect to such Class 3 Disputed Claims, if, when, and to the extent any such Class 3 Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the Claimant on the first business day following the end of the calendar quarter in which the Class 3 Disputed Claim becomes an Allowed Claim (or earlier in the discretion of the Debtors) and in a manner thereafter consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining in the Class 3 Disputed Claim Reserve after all Class 3 Disputed Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed promptly to the Mortgage Lender Designee (and not to the Debtors). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties (including the Mortgage Lender Designee). No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim.

5.    Claims Objection Deadline

Objections to Claims shall be filed and served upon each affected Creditor by the Debtors and/or the Mortgage Lender Designee no later than thirty (30) days after the later of (i) the Confirmation Date ("Objection Deadline") and (ii) the date the Claim is timely filed, provided however, that the Objection Deadline may be extended by the Bankruptcy Court upon motion of the Debtors with the consent of the Mortgage Lender Designee, without notice or hearing, for up to an additional sixty (60) days thereafter. The Objection Deadline shall automatically be extended without further order of the Court during the time period following the filing of the extension motion until such time as the Court enters an order granting or denying the requested extension.

6.    Settlement of Disputed Claims

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in the Plan. After the Effective Date, and subject to the terms of the Plan, the Debtors may settle any Disputed Claim without providing any notice or obtaining an order from the Bankruptcy Court provided, however, that the Mortgage Lender Designee consents in writing to such settlement.

7.    Unclaimed Property

If any distribution remains unclaimed for a period of one hundred and eighty (180) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Equity Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Debtors to be distributed to the Mortgage Lender Designee.

8.    Release of Liens

The Liens securing the Mortgage Loan shall survive Confirmation and the Effective Date and shall remain valid, enforceable and perfected Liens against the Property. On the Effective

Date and except as expressly set forth in the Plan, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtors' estates shall be released and forever discharged, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to the Mortgage Lender Designee and its successors and assigns.

9.    Fractional Cents

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

10.    Payments of Less than Twenty-Five Dollars

If a cash payment otherwise provided for by the Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars, notwithstanding any contrary provision of the Plan, the Debtors shall not be required to make such payment.

### G.    Treatment Of Executory Contracts and Unexpired Leases

1.    Assumption of All Agreements Any and all pre-petition leases or executory contracts (not otherwise previously rejected or the subject of a motion to reject pending on the Confirmation Date), shall be deemed assumed by the Owner and assigned to Mortgage Lender Designee effective as of the Effective Date. Without limiting the forgoing, on the Effective Date, all leases of non-residential property with tenants shall be deemed assumed by Owner and assigned to Mortgage Lender Designee and all Security Deposits shall be transferred to Mortgage Lender Designee in accordance with the terms of the Plan and the Mortgage Lender Designee shall maintain custody and control of all Security Deposits posted by tenants in accordance with the terms of their leases and applicable non-bankruptcy law. Notwithstanding the foregoing, the Mortgage Lender Designee may designate executory contracts that are to be rejected by the Debtors no later than five (5) days prior to the Confirmation Hearing and Debtors shall promptly file such designation, if any, with the Bankruptcy Court and notify all affected counterparties. Any undisputed cure amounts ("Undisputed Cure Amounts") shall be paid on the Effective Date of the Plan with any disputed cure claims ("Disputed Cure Amounts") to be paid upon further agreement of the parties or further order of the Bankruptcy Court. Notwithstanding anything else in this paragraph or the Plan, the Mortgage Lender Designee may designate for rejection any executory contract within 3 days following the entry of an order of the Bankruptcy Court fixing the disputed cure amounts for such contract in which case such contract shall then be deemed to have been rejected as of the Confirmation Date.

2.    Claims for Damages All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases, if any, shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of Effective Date. Any and all proofs of claim with respect to Claims arising from the rejection of executory contracts by Owner shall be treated as Class 3 General Unsecured Claims, for purposes of distribution pursuant to the Plan. Any and all proofs of claim with respect to Claims arising from the rejection of executory contracts by Mezz Debtor and/or

Holder shall be treated as Class 4 Other General Unsecured Claims, for purposes of distribution pursuant to the Plan. Unless otherwise permitted by Final Order, any proof of claim that is not filed before the Bar Date (other than those Claims arising from the rejection of executory contracts or leases under the Plan which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Debtors, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, their Estates, or property of their estates.

## H.    *Conditions to Confirmation and Effective Date*

### 1.    Conditions to Confirmation of the Plan

The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by the Mortgage Lender Designee:

(a)    The Confirmation Order shall be in form and substance satisfactory to the Mortgage Lender Designee and the Mortgage Lender, which Confirmation Order shall approve all provisions, terms and conditions of the Plan; and

(b)    No material amendments, modifications, supplements or alterations shall have been made to the Plan, any document contained in the Plan Supplement or any other document delivered in connection therewith, without the express written consent of the Mortgage Lender Designee, which consent may be granted, withheld, or conditioned in its sole discretion).

### 2.    Conditions to Effectiveness of the Plan

The Plan shall not become effective unless and until (i) the Bankruptcy Court shall have entered the Confirmation Order by December 15, 2011 (or such other date as agreed to by Debtors and the Mortgage Lender Designee), the same shall be in full force and effect and not be subject to any stay or injunction and such Confirmation Order shall be in form and substance satisfactory to the Mortgage Lender Designee, and (ii) the Mortgage Lender Designee shall have closed on the LPA by, *inter alia*, paying Mortgage Lender $62,000,000 in aggregate consideration..

### 3.    Effect of Failure of Condition

In the event that the conditions to effectiveness of the Plan described above (specified in section 9.2 of the Plan) have not occurred on or before thirty (30) days after the Confirmation Date, the Confirmation Order shall be vacated upon order of the Bankruptcy Court upon motion made by the Mortgage Lender Designee.

### 4.    Notice of the Effective Date; Actions Taken on Effective Date

(a)    The Debtors shall file a notice of the occurrence of the Effective Date within five (5) Business Days thereafter.

(b)     Unless otherwise specifically provided in the Plan, any action required to be taken by a Debtor on the Effective Date may be taken by such Debtor on the Effective Date or as soon as reasonably practicable thereafter.

## I.     *Retention of Jurisdiction*

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Debtors, as the case may be, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a) Claims  To determine the allowance, extent, classification, or priority of Claims against the Debtors upon objection by the Debtors or the Mortgage Lender Designee;

(b) Injunction, etc.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

(c) Professional Fees  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the Effective Date, and objections thereto, as provided for in the Plan;

(d) Certain Priority Claims   To determine the allowance, extent and classification of any Priority Tax Claims, Other Priority Claims, Administrative Claims or any request for payment of an Administrative Claim;

(e) Dispute Resolution  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and/or Confirmation Order and the making of distributions hereunder and thereunder;

(f) Executory Contracts and Unexpired Leases  To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance and extent of any Claims resulting from the rejection of executory contracts and unexpired leases;

(g) Actions  To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted (either before or after the Effective Date) in the Chapter 11 Cases by or on behalf of the Debtors;

(h) General Matters  To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code or other applicable law;

(i) <u>Plan Modification</u>  To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(j) <u>Aid Consummation</u>  To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

(k) <u>Protect Property</u>  To protect the Property of the Debtors from adverse Claims or Liens or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan;

(l) <u>Abandonment of Property</u>  To hear and determine matters pertaining to abandonment of property of the Estates;

(m)<u>Implementation of Confirmation Order</u>  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; and

(n) <u>Final Order</u>  To enter a final order closing the Chapter 11 Cases.

## J.    *Miscellaneous Provisions*

### 1.    Pre-Confirmation Modification

On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender and the Mortgage Lender Designee.

### 2.    Post-Confirmation Immaterial Modification

With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice to holders of Claims and Equity Interests, the Debtors may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan; <u>provided</u>, <u>however</u>, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender and the Mortgage Lender Designee.

### 3.    Post-Confirmation Material Modification

On notice to and an opportunity to be heard, the Plan may be altered or amended after the Confirmation Date by the Debtors in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy

Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender Designee.

4.    Withdrawal or Revocation of the Plan

The Debtors, in consultation with the Mortgage Lender Designee and Mortgage Lender, reserve the right prior to the Effective Date to revoke or withdraw the Plan as to any Debtor or all Debtors and, in the event the Plan is withdrawn or revoked with respect one or more Debtors but not all Debtors, proceed with confirmation and/or consummation of the Plan with respect to any Debtor for which the Plan is not withdrawn. If the Debtors revoke or withdraw the Plan (as to all Debtors) or if confirmation or consummation of the Plan (as to all Debtors) does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the allowance, fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests) and any assumption or rejection of executory contracts or leases affected by the Plan shall terminate and be of no further force or effect, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person. In the event the Debtors revoke or withdraw the Plan as to a Debtor or Debtors (but not all Debtors) and proceed with confirmation and/or consummation of the Plan with respect to the Debtors(s) for which the Plan is not withdrawn, then nothing contained herein shall constitute or be deemed a waiver or release of any Claims against or Interests in such Debtor(s) withdrawn from the Plan or any other Person or to prejudice in any manner the rights of such Debtor(s), the Mortgage Lender, the Mortgage Lender Designee, or any Person in any further proceedings involving such withdrawn Debtor(s).

5.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) by the Debtors. The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. Section 1930(a)(6), plus interest due under 31 U.S.C. Section 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Cases, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7.

6.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7.    Exculpation

On the Effective Date, (a) the Debtors, and their direct and indirect parents, subsidiaries and affiliates, together with each of its present and former shareholders, members, managers,

general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) and (b) the Mortgage Lender Designee and the Mortgage Lender and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and shall be deemed released by all holders of Claims or Equity Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring through the date immediately preceding the Effective Date that arise from or are related to the Property and the ownership thereof, including, without limitation, any act or omission occurring during or relating to the Chapter 11 Cases, commencement of the Chapter 11 Cases, the solicitation of acceptances of the Plan, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

8.    Confirmation Injunction

Except as otherwise provided in the Plan, and as set forth in the Confirmation Order, (a) the rights afforded in the Plan and the treatment of all Claims and Equity Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets and properties, (b) on the Effective Date, all such Claims against the Debtors and Equity Interests shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtors, their assets or properties, or any other or further Claims or Equity Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

9.    Comprehensive Settlement of Claims and Controversies

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or causes of action of (a) the Debtors and their Estates, including, without limitation, any Person or Entity seeking to exercise a right in a derivative capacity on behalf of the Estates, and (b) the Released Parties, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, their property and Claim and Equity Interest holders and is fair, equitable and

reasonable. For the avoidance of doubt, the compromise and settlement of all claims and causes of action of the Debtors and their estates as set forth herein shall include any potential avoidance actions accruing to the Debtors or their estates, which shall not be pursued.

10. Preservation of Insurance

The Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, their members, managers or officers) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

11. Cramdown

To the extent any Impaired Class of Equity Interest entitled to vote on the Plan votes to reject the Plan, the Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es), as well as with respect to Classes that are deemed to reject the Plan.

12. Governing Law

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

13. Notices

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

If to the Debtors:  
216 West 18 Owner LLC  
45 Adams Road  
Easton, Connecticut 06612  
Attn: Steven A. Carlson  

with a copy to:  
Bryan Cave LLP  
1290 Avenue of the Americas  
New York, NY 10104  
Attn: Lloyd A. Palans, Esq.  
Michelle McMahon, Esq.  

If to Mortgage Lender Designee:  
Atlas Capital Group, LLC  
505 Fifth Avenue, 28th Floor  
New York, NY 10017  
Attention: Andrew B. Cohen

|                        |                                                  |
|------------------------|--------------------------------------------------|
| with a copy to:        | Greenberg Traurig, LLP                           |
|                        | MetLife Building                                 |
|                        | 200 Park Avenue                                  |
|                        | New York, NY 10166                               |
|                        | Attention: John H. Bae, Esquire                  |
|                        | Gary D. Ticoll, Esquire                          |
|                        |                                                  |
| If to HAJ 18 LLC:      | The Harsh Group                                  |
|                        | 891 Second Avenue, 22nd Floor               |
|                        | New York, New York 10017                         |
|                        | Attention: Harry Jeremias                        |
|                        |                                                  |
| with a copy to:        | Herrick, Feinstein LLP                           |
|                        | 2 Park Avenue                                    |
|                        | New York, NY 10016                               |
|                        | Attention: Jeffrey H. Kaufman, Esquire           |
|                        | Stephen B. Selbst, Esquire                       |
|                        |                                                  |
| If to Mortgage Lender: | 216 W 18 Lender LLC                              |
|                        | c/o Fishman Holdings North America Inc.          |
|                        | 950 3rd Ave., Suite 3101                         |
|                        | New York, NY 10022                               |
|                        | Attention: Yehuda Mor                            |
|                        |                                                  |
| with a copy to:        | Alston & Bird LLP                                |
|                        | 1201 West Peachtree Street                       |
|                        | Atlanta, Georgia 30309                           |
|                        | Attention: Jason H. Watson, Esq.                 |
|                        | David A. Wender, Esq.                            |

14. <u>Saturday, Sunday or Legal Holiday</u>

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

15. <u>Exemption From Transfer Taxes</u>

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection with the Plan, including, without limitation, the delivery of the Property to Mortgage Lender Designee and any other payments and transfers pursuant to the Plan by any Debtor(s) to Mortgage Lender Designee; delivery of deeds, bills of

sale, or other transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

16.    Severability

If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the option of the Mortgage Lender Designee, remain in full force and effect and not be deemed affected. However, the Mortgage Lender Designee reserves the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## VIII.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    *Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim or Equity Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Equity Interest. The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Equity Interest and the period for which the Claim or Interest was held by the holder. The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain. In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation. Accordingly, each holder of a Claim or Equity Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

**B.** **Distributions to Holders of Claims**

The Plan is based on making distributions as provided under the priority scheme set forth in the Bankruptcy Code. To this end, the Plan provides that all Allowed Administrative Claims and Priority Claims will be paid or satisfied in full prior to the making of distributions to holders of Allowed Claims in Class 3. Under the terms of the Plan and subject to the occurrence of the Effective Date, the Mortgage Lender has agreed to (i) waive its deficiency claim of approximately $11,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date and (ii) provide for distributions to Class 3 Owner General Unsecured Claims. Absent the foregoing, there would be no distributions to Class 3 Creditors.

**C.** **Objections to Classification**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

**D.** **Certain Bankruptcy Law Considerations**

1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. The Plan represents a negotiated settlement between all impaired creditors so the Debtors believe the same is fair and non-discriminatory, is in the best interests of creditors and is feasible and not likely to be followed by a further liquidation. However, there can be no guarantee that the Bankruptcy Court will reach the same conclusion.

2.    Risk of Non-Occurrence of the Effective Date

The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied although the Debtors do not anticipate the same.

3.    Appeal of the Confirmation Order

The Confirmation Order may be the subject of an appeal. If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization.

## A.    Liquidation Under Chapter 7

If the Plan is not confirmed, the case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as Exhibit B to this Disclosure Statement. The Debtors believe that liquidation (or foreclosure of the Mortgage) under Chapter 7 will result in smaller distributions being made to Creditors than those provided for in the Plan because (i) the Debtors' assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be incurred, (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a termination of the Debtors' businesses, (iv) the liens in favor of the Mortgage Lender significantly exceed the value of the Debtors' property, and (v) the Plan provides for payment of 19.6% to Creditors holding Allowed Owner Unsecured Claims while a forced liquidation will result in all unsecured creditors receiving no distribution on account of their claims.

## B.    Alternative Plan of Reorganization

The Debtors believe that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets (including foreclosure of the Mortgage) or alternative form of Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtors believe that their Plan provides the best recovery to their creditors by providing them with a distribution rather than no recoveries following a liquidation of their assets.

# X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    Federal Income Tax Consequences in General

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims in Class 2 and 3. The summary is based upon the Debtors' interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect

to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in Class 2 and 3.

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors' interpretation of the federal income tax consequences set forth herein is not binding on the IRS, and the Debtors have not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS. No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST. ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE PLAN. IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.**     *Federal Income Tax Consequences to the Debtors*

1.     Cancellation of Indebtedness

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of discharge has been determined Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

## C.     *Federal Income Tax Consequences to Holders of Allowed Claims in Class 2 and 3*

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 2 and 3 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States. The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

### 1.     Receipt of Cash and Property by Holders of Allowed Claims in Class 2 and 3

Generally, a holder of an Allowed Claim in Class 2 and 3 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim. In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

### 2.     Receipt of Interest

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS

AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 3. Character of Gain or Loss

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

### 4. Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

### D. *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

**[The Remainder of the Page Intentionally Left Blank]**

## CONCLUSION

The Debtors believe the Plan is in the best interest of all Creditors and recommends those entitled to vote to accept the Plan.

DATED: September 26, 2011

**DEBTORS:**

**216 WEST 18 OWNER LLC,**
**a Delaware limited liability company**

By:  */s/ Steven A. Carlson*
    Name:  Steven A. Carlson
    Title:  Chief Restructuring Officer

**216 WEST 18 MEZZ LLC,**
**a Delaware limited liability company**

By:  */s/ Steven A. Carlson*
    Name:  Steven A. Carlson
    Title:  Chief Restructuring Officer

**216 WEST 18 HOLDER LLC,**
**a Delaware limited liability company**

By:  */s/ Steven A. Carlson*
    Name:  Steven A. Carlson
    Title:  Chief Restructuring Officer

# EXHIBIT A

BRYAN CAVE LLP
Lloyd A. Palans (LP-8572)
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
|  |  |
|---|---|
| In re: | :    Chapter 11 Case No. |
|  | : |
| 216 West 18 Owner LLC, *et al.,* | :    [            ] |
|  | : |
| Debtors. | :    (Jointly Administered) |
|  | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>DEBTORS' PREPACKAGED LIQUIDATING CHAPTER 11 PLAN</u>

BRYAN CAVE LLP
Lloyd A. Palans (LP-8572)
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

*Attorneys for Debtors*
Dated: September 26, 2011

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

ARTICLE I DEFINITIONS ..................................................................................................1

ARTICLE II METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND
        GENERAL PROVISIONS AND CLASSIFICATION OF CLAIMS AND
        INTERESTS.............................................................................................8
    2.1.    General Rules of Classification ..............................................................8
    2.2.    Administrative Claims, Priority Tax Claims and Fee Claims.................9
    2.3.    Bar Date for Administrative Claims .......................................................9
    2.4.    Bar Date for Fee Claims ..........................................................................9
    2.5.    Classification of Claims and Interests....................................................9

ARTICLE III TREATMENT OF UNCLASSIFIED CLAIMS.............................................9
    3.1.    Administrative Claims ...........................................................................9
    3.2.    Priority Tax Claims...............................................................................10
    3.3.    Fee Claims .............................................................................................10

ARTICLE IV CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
        AND EQUITY INTERESTS ..................................................................10
    4.1.    Class 1 Other Priority Claims ...............................................................10
    4.2.    Class 2 Mortgage Lender Claim ...........................................................10
    4.3.    Class 3 Owner General Unsecured Claims ...........................................11
    4.4.    Class 4 Other General Unsecured Claims.............................................11
    4.5.    Class 5 Mezzanine Loan Claim .............................................................12
    4.6.    Class 6 Equity Interests.........................................................................12
    4.7.    Reservation of Rights.............................................................................12

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ...................................12
    5.1.    Corporate Action...................................................................................12

ARTICLE VI RELEASES.....................................................................................................12
    6.1.    Releases by the Debtors ........................................................................12
    6.2.    Injunction ..............................................................................................13

ARTICLE VII DISTRIBUTIONS UNDER THE PLAN......................................................13
    7.1.    Distributions for Claims Allowed as of the Effective Date .................13
    7.2.    Delivery of Distributions ......................................................................13
    7.3.    Reserves for Administrative, Priority Tax and Other Priority Claims............14
    7.4.    Reserves for Disputed Claims...............................................................14
    7.5.    Claims Objection Deadline ...................................................................14
    7.6.    Settlement of Disputed Claims ..............................................................15
    7.7.    Unclaimed Property ..............................................................................15

7.8.   Release of Liens ........................................................................................15
7.9.   Fractional Cents ........................................................................................15
7.10.  Payments of Less than Twenty-Five Dollars ..........................................15

ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ............................15
8.1.   Assumption of All Agreements ...............................................................15
8.2.   Claims for Damages ..................................................................................16

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ......................16
9.1.   Conditions to Confirmation of the Plan ................................................16
9.2.   Conditions to Effectiveness of the Plan .................................................17
9.3.   Effect of Failure of Condition .................................................................17
9.4.   Notice of the Effective Date; Actions Taken on Effective Date ...................17

ARTICLE X RETENTION OF JURISDICTION ........................................................17
10.1.  Jurisdiction ..............................................................................................17

ARTICLE XI MISCELLANEOUS PROVISIONS ......................................................19
11.1.   Pre-Confirmation Modification ..............................................................19
11.2.   Post-Confirmation Immaterial Modification .........................................19
11.3.   Post-Confirmation Material Modification .............................................19
11.4.   Withdrawal or Revocation of the Plan ...................................................19
11.5.   Payment of Statutory Fees .....................................................................20
11.6.   Successors and Assigns ...........................................................................20
11.7.   Exculpation .............................................................................................20
11.8.   Confirmation Injunction ........................................................................20
11.9.   Comprehensive Settlement of Claims and Controversies ....................21
11.10.  Preservation of Insurance .......................................................................21
11.11.  Cramdown ...............................................................................................21
11.12.  Governing Law ........................................................................................21
11.13.  Notices .....................................................................................................21
11.14.  Saturday, Sunday or Legal Holiday .......................................................22
11.15.  Exemption From Transfer Taxes ............................................................22
11.16.  Severability ..............................................................................................23
11.17.  Headings ..................................................................................................23

## INTRODUCTION

216 West 18 Owner LLC; 216 West 18 Mezz LLC; and 216 West 18 Holder LLC, the above-captioned Debtors[1], hereby propose this Pre-Packaged Liquidating Chapter 11 Plan pursuant to section 1121 of the Bankruptcy Code. Reference is made to the Disclosure Statement for risk factors and a summary and analysis of the Plan and certain related matters. The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XI of this Plan, the Debtors expressly reserve the right to alter, amend, supplement or modify this Plan, one or more times, before its substantial consummation.

## ARTICLE I

## DEFINITIONS

1.1. **Scope of Definitions**. As used in this Plan, the following terms shall have the respective meanings specified below. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

1.2. **"Accrued"** shall mean an expense incurred but not yet billed for nor paid.

1.3. **"Acquisition Loan"** shall mean the pre-petition secured loan in accordance with the terms of that certain loan agreement, as modified, amended, and/or restated from time to time, by Owner as borrower, dated as of April 17, 2007, in the aggregate principal amount of $27,763,992.82 as of the Petition Date plus interest, costs, fees, penalties and expenses.

1.4. **"Adequate Protection Lien"** shall have the meaning ascribed to it in the Cash Collateral Order.

1.5. **"Administrative Claim"** shall mean a Claim under section 503(b) (including, without limitation, all administrative claims under Section 503(b)(9) and 1114(e)(2) of the Bankruptcy Code) or determined to be an Allowed Administrative Claim by a Final Order that is entitled to priority under sections 507(a)(1) or 507(b) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Cases including, without limitation, any actual and necessary expenses of operating the businesses of the Debtors or preserving the estates incurred after the Petition Date, and any and all fees and expenses of Professionals Filed under sections 330, 331 or 503 of the Bankruptcy Code.

1.6. **"Administrative Claims Bar Date"** shall have the meaning ascribed to such term in section 2.3 of this Plan.

---

[1] Capitalized terms not defined in this Introduction shall have the meanings set forth in Article I of this Plan.

1.7.   "**Administrative Claims Reserve**" shall have the meaning ascribed to such term in section 7.3 of this Plan.

1.8.   "**Allowed Claim**" or "**Allowed Administrative Claim**" shall mean: (a) any Claim, proof of which is/was Filed with the Bankruptcy Court or the Debtors' court-appointed claims agent on or before the date designated by the Bankruptcy Court as of the last date(s) for filing proofs of claim with respect to such Claim, or which has been or hereafter is scheduled by the Debtors as liquidated in amount and not disputed or contingent and which, in either case, is a Claim as to which no objection to the allowance thereof has been Filed within the applicable period of limitation (if any) for objection to Claims fixed by the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court (allowing such Claim in whole or in part); (b) a Claim that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) in a Final Order or (iii) pursuant to the terms of the Plan; or (c) a request for payment of an Administrative Claim, which is made before the Administrative Claims Bar Date, or otherwise has been deemed timely asserted under applicable law, and is an Administrative Claim as to which no objection to allowance thereof has been Filed within the applicable deadline pursuant to Section 2.3 of the Plan.   Except as otherwise specified in this Plan or a Final Order, the amount of an Allowed Claim shall not include interest on such Claim after the filing of the Chapter 11 Cases.

1.9.   "**Ballot**" shall mean the form or forms that will be distributed along with the Disclosure Statement to holders of Allowed Claims in classes that are Impaired under the Plan and entitled to vote, which the holders of Impaired Claims may use to vote to accept or reject the Plan.

1.10.   "**Bank**" shall mean Bank of America, N.A.

1.11.   "**Bankruptcy Code**" shall mean title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.12.   "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of New York or such other court as may hereafter be granted jurisdiction over the Chapter 11 Cases.

1.13.   "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.14.   "**Bar Date**" shall mean the date set by the Bankruptcy Court as the last day to file proofs of Claim pursuant to the Bar Date Order to be entered by the Bankruptcy Court.

1.15.   "**Bar Date Order**" shall mean the order to be entered by the Bankruptcy Court setting the Bar Date.

1.16.   "**Building Loan**" shall mean the pre-petition secured loan in accordance with the terms of that certain Loan Agreement, as modified, amended, and/or restated from time to time, by Owner as borrower, and Bank as lender, dated as of April 17, 2007, in the aggregate principal

amount of $10,287,500.00 as of the Petition Date plus interest, costs, fees, penalties and expenses.

1.17. "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday as such term is defined in Bankruptcy Rule 9006.

1.18. "**Cash**" shall mean cash and cash equivalents, including, but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.19. "**Cash Collateral Order**" shall mean the interim and/or final Order(s) (A) Authorizing Debtors to Utilize Cash Collateral and Grant Replacement Security Interests and Super Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 363 in favor of Mortgage Lender; and (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362.

1.20. "**Chapter 11 Cases**" shall mean the above-captioned chapter 11 cases pending for the Debtors.

1.21. "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

1.22. "**Class**" shall mean a category of holders of Claims or Equity Interests, as classified pursuant to Article II of this Plan.

1.23. "**Class 3 Disputed Claims Reserve**" shall have the meaning ascribed to such term in section 7.4 of this Plan.

1.24. "**Committee**" shall mean the Official Committee of Unsecured Creditors, if any, appointed by the Office of the United States Trustee and as reconstituted from time to time and existing as of the Confirmation Date.

1.25. "**Confirmation**" shall mean the entry of the Confirmation Order on the docket of the Bankruptcy Court.

1.26. "**Confirmation Date**" shall mean the date of entry of an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of the Bankruptcy Code.

1.27. "**Confirmation Hearing**" shall mean the hearing to confirm the Plan.

1.28. "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.29. "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.30. "**Debtors**" shall mean Holder, Owner, and Mezz Debtor, each a Debtor.

1.31.  "**Deficiency Claim**" shall mean, with respect to a Claim that is partially secured, the amount by which the Allowed amount of such Claim exceeds the value of the property owned or held by the Debtors that collateralizes the Claim.

1.32.  "**Disclosure Statement**" shall mean the disclosure statement respecting the Plan, as approved by the Bankruptcy Court as containing adequate information in accordance with section 1125 of the Bankruptcy Code, all exhibits and annexes thereto and any amendments or modifications thereof.

1.33.  "**Disputed Claim**" shall mean any Claim, including any Administrative Claim, which has not become an Allowed Claim pursuant to the Plan or a Final Order.

1.34.  "**Disputed Claims Reserve**" shall have the meaning ascribed to such term in section 7.4 herein.

1.35.  "**Disputed Cure Amounts**" shall have the meaning ascribed to such term in section 8.1 herein.

1.36.  "**Disputed Equity Interest**" shall mean any Equity Interest which has not become an Allowed Equity Interest pursuant to the Plan or a Final Order.

1.37.  "**Effective Date**" shall mean the first Business Day following the date on which each of the conditions set forth in sections 9.1 and 9.2 of the Plan have been satisfied or waived in accordance with such sections; provided that if a stay of the Confirmation Order is in effect, then the Effective Date shall mean the first Business Day after such stay is no longer in effect.

1.38.  "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.39.  "**Equity Interest**" shall mean the interest of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.40.  "**Estates**" shall mean the estates of the Debtors.

1.41.  "**Fee Claim**" shall mean a claim under sections 327, 330(a), 503 or 1103 of the Bankruptcy Code for the compensation of a Professional for services rendered or reimbursement of expenses incurred in the Chapter 11 Cases on or prior to the Effective Date which has been approved by a Final Order (including expenses of the members of the Committee, if any).

1.42.  "**Fee Claim Bar Date**" shall have the meaning ascribed to such term in section 2.4 of this Plan.

1.43.  "**File**", "**Filed**", or "**Filing**" shall mean file, filed or filing with the United States Bankruptcy Court for the Southern District of New York, or with respect to proofs of claim,

proofs timely and properly transmitted to the Clerk of the Court or to the Debtors' claims agent to the extent one is appointed pursuant to Order of the Bankruptcy Court.

1.44. "**Final Order**" shall mean an order entered by the Bankruptcy Court or any other court exercising competent jurisdiction over the subject matter and the parties which has not been reversed, amended or stayed and as to which (i) no appeal, certiorari proceeding or other review reconsideration or rehearing has been requested or is still pending, and (ii) the time for filing a notice of appeal or petition for certiorari or further review reconsideration or rehearing has expired.

1.45. "**General Unsecured Claim**" shall mean any unsecured, non-priority Claim, including, without limitation, any Indemnification Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, or Secured Claim.

1.46. "**Holder**" shall mean 216 West 18 Holder LLC.

1.47. "**Impaired**" shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

1.48. "**Indemnification Claim**" shall mean a Claim for indemnification or advancement.

1.49. "**Liens**" shall mean valid and enforceable liens, mortgages, security interests, pledges, charges, encumbrances, or other legally cognizable security devices of any kind.

1.50. "**LPA**" shall mean the Loan Purchase Agreement, dated as of September 9, 2011, between Mortgage Lender Designee and Mortgage Lender.

1.51. "**Mezz Debtor**" shall mean 216 West 18 Mezz LLC.

1.52. "**Mezzanine Loan**" shall mean the pre-petition secured loan in accordance with the terms of that certain Loan Agreement, as modified, amended, and/or restated from time to time, by Mezz Debtor as borrower, and Bank as lender, dated as of April 17, 2007 in the aggregate principal amount of $19,560,000.00 plus interest, costs, fees, penalties and expenses which, as of September 14, 2011, aggregated $24,632,345.08.

1.53. "**Mezzanine Lender**" shall mean 216 W 18 Lender LLC or its successors, designees and/or assignees.

1.54. "**Mortgage**" shall mean that certain first Mortgage and Agreement of Consolidation and Modification of Mortgage, Assignment of Leases and Rents, and Security Agreement, dated as of April 17, 2007, granted by Owner in favor of Bank, which granted to Bank a lien on and security interest in the Mortgaged Property.

1.55. "**Mortgage Lender**" shall mean 216 W 18 Lender LLC or its successors, designees and/or assignees.

1.56. "**Mortgage Lender Allowed Deficiency Claim**" shall have the meaning ascribed to it in Section 4.2 herein.

1.57. "**Mortgage Lender Allowed Secured Claim**" shall have the meaning ascribed to it in section 4.2 herein.

1.58. "**Mortgage Lender Designee**" means 18th Street Owner LLC, a Delaware single member limited liability company.

1.59. "**Mortgage Loan**" shall mean the pre-petition secured loan of Owner as borrower, and Bank as lender, consisting of the Acquisition Loan, the Project Loan, and the Building Loan in the aggregate principal amount of $48,000,000.00 as of the Petition Date plus interest, costs, fees, penalties and expenses which, as of September 15, 2011, aggregated $73,518,067.26.

1.60. "**Mortgage Loan Documents**" shall mean those documents listed on Exhibit A to the Plan, and as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

1.61. "**Mortgaged Property**" shall mean Owner's interests in that certain parcel of improved real estate located at 218 West 18th Street, New York, New York, together with the Debtors' interest in any of the improvements on such property and in all furniture, fixtures, equipment and all leases, rents, issues and profits related thereto.

1.62. "**Other Priority Claim**" shall mean any Claim against the Debtors entitled to priority in payment under section 507(a) of the Bankruptcy Code other than an Administrative Claim, Fee Claim or Priority Tax Claim.

1.63. "**Owner**" shall mean 216 West 18 Owner LLC.

1.64. "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.65. "**Petition Date**" shall mean the date upon which the Debtors file their petitions under Chapter 11 of the Bankruptcy Code.

1.66. "**Plan**" shall mean this Prepackaged Liquidating Chapter 11 Plan, all exhibits hereto and any amendments or modifications hereof made in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

1.67. "**Plan Expenses**" shall mean all actual and necessary costs and expenses incurred after the Effective Date in connection with the administration of the Plan, including, but not limited to, (i) the Debtors' costs, expenses and legal fees incurred related to filing and prosecuting objections to Claims, and (ii) Statutory Fees.

1.68. "**Plan Support Agreement**" shall mean each Plan Support Agreement in which a holder of a General Unsecured Claim or Equity Interest reached certain agreements with the Debtors, including to support this Plan.

1.69. "**Priority Tax Claim**" shall mean any Claim for taxes against the Debtors entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

1.70. "**Professionals**" shall mean those Persons (i) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered to the Debtors prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.71. "**Project Loan**" shall mean the pre-petition secured loan in accordance with the terms of that certain Loan Agreement, as modified, amended, and/or restated from time to time, by Owner as borrower, and Bank as lender, dated as of April 17, 2007, in the aggregate principal amount of $9,948,507.18 as of the Petition Date plus interest, costs, fees, penalties and expenses.

1.72. "**Property**" means all of Owner's right, title, and interest in any and all property of any nature whatsoever, real or personal, tangible or intangible, previously or now owned by Owner, or acquired by a Owner's estate, as defined in section 541 of the Bankruptcy Code, encumbered by the Mortgage Loan Documents and/or any order of the Bankruptcy Court, including without limitation, the Mortgaged Property. For the avoidance of doubt, Property includes, without limitation, any and all property encumbered by Adequate Protection Liens and all Security Deposits.

1.73. "**Receiver**" shall mean Andrew L. Herz as the temporary receiver of the Mortgaged Property.

1.74. "**Reduced Mortgage Lender Allowed Secured Claim**" shall have the meaning ascribed to such term in Section 4.2 of this Plan.

1.75. "**Rejection Damage Claim**" shall mean a Claim arising from the rejection, under section 365 of the Bankruptcy Code or under the Plan, of an executory contract or unexpired lease of a Debtor.

1.76. "**Released Parties**" means (i) Atlas Capital Group, LLC, (ii) Atlas Capital Investors II, LLC, (iii) 216 W 18 Lender LLC, (iv) Fishman Holdings North America Inc., (v) Bank of America, NA in its capacity as original lender under the Mortgage Loan, (vi) the Receiver, (vii) GreenOak Real Estate Advisors LP, (viii) Mortgage Lender Designee, and (ix) the officers, directors and employees of the Debtors, including but not limited to Steven A. Carlson as the Debtors' chief restructuring officer, and in the case of each of (i) - (viii) each such entities' respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants.

1.77. "**Schedules**" shall mean the Debtors' Schedules of Assets and Liabilities Filed pursuant to Bankruptcy Rule 1007 as they may be amended from time to time.

1.78. "**Secured Claim**" shall mean all or a portion of a Claim existing on the Petition Date that constitutes a secured claim as defined in Section 506(a)(1) of the Bankruptcy Code, as finally allowed and approved by the Bankruptcy Court.

1.79. "**Security Deposits**" shall mean security deposits posted by tenants of Owner in accordance with the terms of their leases with Owner and applicable non-bankruptcy law.

1.80. "**Statutory Fees**" shall mean all fees payable pursuant to section 1930 of Title 28 of the United States Code and Section 3717 of Title 31 of the United States Code.

1.81. "**Undisputed Cure Amounts**" shall have the meaning ascribed to such term in section 8.1 of this Plan.

1.82. "**Unimpaired**" shall mean, with respect to a Class of Claims, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

All terms not expressly defined herein shall have the respective meanings given to such terms in section 101 of the Bankruptcy Code or as otherwise defined in applicable provisions of the Bankruptcy Code.

Unless otherwise specified herein, any reference to an Entity as a holder of a Claim or Equity Interest includes, with respect to such Claim or Equity Interest, that Entity's successors, assigns and affiliates. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be timely filed in accordance with this Plan. Holders of Claims and Equity Interests may obtain a copy of the filed Exhibits upon written request to the Debtors. Upon their filing, the Exhibits may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours. The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## ARTICLE II

## METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND GENERAL PROVISIONS AND CLASSIFICATION OF CLAIMS AND INTERESTS

2.1. **General Rules of Classification**. Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2.2.    **Administrative Claims, Priority Tax Claims and Fee Claims**. Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1123(a)(l) of the Bankruptcy Code.

2.3.    **Bar Date for Administrative Claims**. Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Debtors, and their counsel, no later than thirty (30) days after the Effective Date (the "**Administrative Claims Bar Date**"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Debtors and their counsel, and the party requesting payment of an Administrative Claim within thirty (30) days after the filing of such request for payment.  All Post-Petition Date ordinary course administrative claims shall be paid in the ordinary course during the Chapter 11 Cases.

2.4.    **Bar Date for Fee Claims**. Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date must be filed and served on the Debtors and their counsel no later than twenty (20) days after the Effective Date (the "**Fee Claim Bar Date**").

2.5.    **Classification of Claims and Equity Interests**. The following is the designation of the Classes of Claims and Equity Interests under the Plan:

(a)     Class 1 Claims shall consist of all Other Priority Claims.

(b)     Class 2 Claims shall consist of the Mortgage Lender Claim.

(c)     Class 3 Claims shall consist of all General Unsecured Claims against Owner.

(d)     Class 4 Claims shall consist of all General Unsecured Claims against Mezz Debtor and Holder.

(e)     Class 5 Claims shall consist of the Mezzanine Loan Claim.

(f)     Class 6 Equity Interests shall consist of Equity Interests.

# ARTICLE III

# TREATMENT OF UNCLASSIFIED CLAIMS

3.1.    **Administrative Claims**. Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Administrative Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Administrative Claim, or upon such other terms as may be agreed upon by

the holder of such Allowed Administrative Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim, the Debtors, and the Mortgage Lender Designee might otherwise agree. Notwithstanding the foregoing, the Statutory Fees shall be paid in Cash as soon as practicable after the Effective Date.

3.2. **Priority Tax Claims**. Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim the full amount thereof, without post-Petition Date interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim, the Debtors, and the Mortgage Lender Designee.

3.3. **Fee Claims**. Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash after such Fee Claim becomes an Allowed Claim.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims against and Equity Interests in the Debtors for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

4.1. **Class 1 Other Priority Claims**. Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Other Priority Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Other Priority Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Other Priority Claim, the Debtors, and the Mortgage Lender Designee or (b) such lesser amount as the holder of such Allowed Other Priority Claim, the Debtors, and the Mortgage Lender Designee might otherwise agree. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote and is conclusively presumed to accept this Plan.

4.2. **Class 2 Mortgage Lender Claim**. Mortgage Lender shall have an Allowed Secured Claim in respect of the Mortgage Loan in the amount of $73,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date (the "**Mortgage Lender Allowed Secured Claim**"). The Mortgage Lender has agreed that solely in connection with the confirmation of this Plan, the Mortgage Lender Allowed Secured Claim shall be reduced to the total amount of $62,000,000.00 (the "**Reduced Mortgage Lender**

**Allowed Secured Claim**"). On the Effective Date, in full and complete satisfaction of the Reduced Mortgage Lender Allowed Secured Claim, Owner shall transfer and convey (the "**Property Transfer**") to the Mortgage Lender Designee all the Property, free and clear of all Claims, Liens, charges, interests and encumbrances other than the Mortgage and any other Liens, charges, interests, and/or encumbrances under the Mortgage Loan Documents; provided, however, that the Owner shall retain, and not transfer to Mortgage Lender Designee on the Effective Date (i) Cash needed to make other payments on the Effective Date pursuant to the terms of this Plan; (ii) the Administrative Claims Reserve; (iii) the Class 3 Disputed Claims Reserve; and (iv) sufficient Cash reserve to pay Statutory Fees; provided, further, that (x) following resolution and payment of the Claims provided for by the Administrative Claims Reserve, the Debtors, in accordance with section 7.3 of this Plan, shall transfer promptly to the Mortgage Lender Designee any balance remaining in the Administrative Claims Reserve and (y) following resolution and payment of the Claims provided for by the Class 3 Disputed Claims Reserve, the Debtors, in accordance with section 7.4 of this Plan, shall transfer promptly to the Mortgage Lender Designee any balance remaining in the Class 3 Disputed Claims Reserve. The balance of the Mortgage Lender Claim in the amount of approximately $11,518,067.26 plus interest, costs, fees, penalties, and expenses accrued between September 15, 2011 and the Petition Date (the "**Mortgage Lender Allowed Deficiency Claim**"), solely in connection with the Confirmation and Effective Date of this Plan, shall be deemed waived and extinguished on the Effective Date. Mortgage Lender reserves the right to assert and vote the Mortgage Lender Allowed Deficiency Claim as a Class 3 Claim but only in the event the Debtors amend the Plan and/or seek to utilize the cram-down provisions of Section 1129(b) as to Class 3 Owner General Unsecured Claims. Mortgage Lender is impaired and therefore, is entitled to vote. Nothing contained in this section or the Plan shall have the effect or be deemed to have the effect of discharging or terminating the Mortgage, the Mortgage Loan, or any other Mortgage Loan Documents, provided, however; that upon the occurrence of the Property Transfer, any and all obligations of the Debtors under the Mortgage, the Mortgage Loan, and any other Mortgage Loan Documents shall be deemed waived, extinguished, and discharged. The Mortgage Lender Designee shall acquire the Property subject to the same. In addition to the transfers set forth above, as a condition to the Effective Date of the Plan and contemporaneous with such Effective Date unless Mortgage Lender Designee has previously paid Mortgage Lender $62,000,000 in aggregate consideration, the Mortgage Lender Designee shall close on the LPA by, *inter alia*, paying Mortgage Lender $62,000,000 in aggregate consideration.

4.3.     **Class 3 Owner General Unsecured Claims**. This Class shall consist of General Unsecured Claims against Owner other than the Mortgage Lender Deficiency Claim. Each holder of a General Unsecured Claim shall receive cash on the Effective Date or as soon as practicable thereafter in the amount of 19.6% of its Allowed Claim (without interest). The holders of Claims in this Class are impaired and therefore entitled to vote on the Plan.

4.4.     **Class 4 Other General Unsecured Claims**. This Class shall consist of all General Unsecured Claims against Mezz Debtor and Holder. Holders of Allowed Class 4 Claims will not receive any distribution of any kind under the Plan on account of their Allowed Other General Unsecured Claims. The holders of Claims in this Class are impaired and are deemed to reject the Plan.

4.5. **Class 5 Mezzanine Loan Claim** This Class shall consist of the Claim of the Mezzanine Lender against the Mezz Debtor in connection with the Mezzanine Loan. The Mezzanine Lender will not receive any distribution of any kind under the Plan on account of the Mezzanine Loan. The holders of Claims in this Class are impaired and are deemed to reject the Plan.

4.6. **Class 6 Equity Interests** This Class shall consist of all Equity Interests. On the Effective Date, Class 6 Equity Interests shall be deemed cancelled, null and void and of no force and effect. Holders of Allowed Equity Interests will not receive any distribution of any kind under the Plan on account of Allowed Equity Interests, and are deemed to reject the Plan.

4.7. **Reservation of Rights**. Nothing contained herein shall be deemed to limit the right of the Debtors, the Mortgage Lender Designee, or the United States Trustee to object to any Administrative Claims (including without limitation Fee Claims and Cure Amounts), Priority Claims, Other Priority Claims, General Unsecured Claims (including without limitation Claims for rejection damages under Section 365 of the Bankruptcy Code) and Secured Claims filed in these Chapter 11 Cases other than the Mortgage Lender Claim which is deemed Allowed and not subject to objection. Nothing contained herein shall affect the Debtors' rights and defenses both legal and equitable, with respect to all members of any Unimpaired Classes including but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against members of any Unimpaired Classes subject to the releases granted herein.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

5.1. **Corporate Action**. Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders and/or members, or the Debtors' boards of directors, managers, and/or managing members. As soon as practicable following the Effective Date, each of the Debtors shall dissolve or otherwise terminate its existence, by filing a certificate of dissolution and a copy of the Confirmation Order and any other necessary documents with applicable state authority.

## ARTICLE VI

## RELEASES

6.1. **Releases by the Debtors**. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration provided by each of the Released Parties, on the Effective Date and effective as of the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all direct, indirect or derivative claims, obligations, rights, suits, judgments, Liens, damages, causes of action, remedies, liabilities, claims or rights of contribution and indemnification, and all other claims, causes of action, controversies of every type, kind, nature, description or character whatsoever, including any derivative claims asserted on behalf of the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated,

contingent or fixed, currently existing or hereafter arising, in law, at equity, whether for tort, fraud, contract or otherwise, that the Debtors would have been legally entitled to assert, including, but not limited to, any claim or cause of action arising from or relating to the Debtors, the Chapter 11 Cases, the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest of the Released Parties that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place, in each case to the extent incurred on or prior to the Effective Date, other than in each case claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

6.2. **Injunction**. On the Effective Date, the Debtors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, including asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted by the Debtors and their Estates to the Released Parties pursuant to the Plan. The Confirmation Order shall specifically provide for such injunction.

The releases and injunctions granted in favor of the Released Parties are integral parts of the Plan and are necessary to confirm the Plan.

## ARTICLE VII

## DISTRIBUTIONS UNDER THE PLAN.

7.1. **Distributions for Claims Allowed as of the Effective Date**. Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. The Debtors shall make all distributions required to be made under the Plan. As a condition to the Effective Date of the Plan and contemporaneous with such Effective Date unless Mortgage Lender Designee has previously paid Mortgage Lender $62,000,000 in aggregate consideration, the Mortgage Lender Designee shall close on the LPA by, *inter alia*, paying Mortgage Lender $62,000,000 in aggregate consideration.

7.2. **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors have been notified in writing of a change of address, including by the filing of a proof of claim or Administrative Claim request that contains an address for a holder of a Claim different from the address for such holder reflected on any Schedule.

7.3. **Reserves for Administrative, Priority Tax and Other Priority Claims**. On or before the Effective Date, the Debtors shall establish and maintain a reserve in an amount equal to the sum of (i) all Disputed Administrative Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Other Priority Claims, if any, in an amount equal to what would be distributed to holders of Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, and Disputed Cure Amounts if their Disputed Claims have been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Debtors and/or the Mortgage Lender Designee and (ii) an estimated amount for unpaid Fee Claims and any other Administrative Claims that have not been filed as of the Effective Date, such amount to be agreed upon by the Debtors and the Mortgage Lender Designee or such other amount as may be fixed by the Bankruptcy Court (together, the "**Administrative Claims Reserve**"). With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Fee Claims, Disputed Administrative Claims, Disputed Cure Amounts, Disputed Priority Tax Claims, and Disputed Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed promptly to the Mortgage Lender Designee (and not to the Debtors). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties (including the Mortgage Lender Designee).

7.4. **Reserves for Disputed Claims**. On or before the Effective Date, the Debtors shall establish and maintain a reserve ("**Class 3 Disputed Claims Reserve**") for all Class 3 Disputed Claims, including any Disputed Rejection Damage Claims. For purposes of establishing a reserve for Class 3 Disputed Claims, Cash will be set aside in an amount equal to the amount that would have been distributed to the holders of Class 3 Disputed Claims had their Class 3 Disputed Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Debtors and/or the Mortgage Lender Designee. With respect to such Class 3 Disputed Claims, if, when, and to the extent any such Class 3 Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the Claimant on the first business day following the end of the calendar quarter in which the Class 3 Disputed Claim becomes an Allowed Claim (or earlier in the discretion of the Debtors) and in a manner thereafter consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining in the Class 3 Disputed Claim Reserve after all Class 3 Disputed Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed promptly to the Mortgage Lender Designee (and not to the Debtors). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties (including the Mortgage Lender Designee). No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim.

7.5. **Claims Objection Deadline**. Objections to Claims shall be filed and served upon each affected Creditor by the Debtors and/or the Mortgage Lender Designee no later than thirty (30) days after the later of (i) the Confirmation Date ("**Objection Deadline**") and (ii) the date the

Claim is timely filed, provided however, that the Objection Deadline may be extended by the Bankruptcy Court upon motion of the Debtors with the consent of the Mortgage Lender Designee, without notice or hearing, for up to an additional sixty (60) days thereafter. The Objection Deadline shall automatically be extended without further order of the Court during the time period following the filing of the extension motion until such time as the Court enters an order granting or denying the requested extension.

7.6.    **Settlement of Disputed Claims**. Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section. After the Effective Date, and subject to the terms of this Plan, the Debtors may settle any Disputed Claim without providing any notice or obtaining an order from the Bankruptcy Court provided, however, that the Mortgage Lender Designee consents in writing to such settlement.

7.7.    **Unclaimed Property**. If any distribution remains unclaimed for a period of one hundred and eighty (180) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Equity Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Debtors to be distributed to the Mortgage Lender Designee.

7.8.    **Release of Liens**. The Liens securing the Mortgage Loan shall survive Confirmation and the Effective Date and shall remain valid, enforceable and perfected Liens against the Property. On the Effective Date and except as expressly set forth in this Plan, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtors' estates shall be released and forever discharged, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to the Mortgage Lender Designee and its successors and assigns.

7.9.    **Fractional Cents**. Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

7.10.    **Payments of Less than Twenty-Five Dollars**. If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Debtors shall not be required to make such payment.

## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

8.1.    **Assumption of All Agreements**. Any and all pre-petition leases or executory contracts (and not otherwise previously rejected or the subject of a motion to reject pending on the Confirmation Date), shall be deemed assumed by the Owner and assigned to Mortgage

Lender Designee effective as of the Effective Date. Without limiting the forgoing, on the Effective Date, all leases of non-residential property with tenants shall be deemed assumed by Owner and assigned to Mortgage Lender Designee and all Security Deposits shall be transferred to Mortgage Lender Designee in accordance with the terms of this Plan and the Mortgage Lender Designee shall maintain custody and control of all Security Deposits posted by tenants in accordance with the terms of their leases and applicable non-bankruptcy law. Notwithstanding the foregoing, the Mortgage Lender Designee may designate executory contracts that are to be rejected by the Debtors no later than five (5) days prior to the Confirmation Hearing and Debtors shall promptly file such designation, if any, with the Bankruptcy Court and notify all affected counterparties. Any undisputed cure amounts (**"Undisputed Cure Amounts"**) shall be paid on the Effective Date of the Plan with any disputed cure claims (**"Disputed Cure Amounts"**) to be paid upon further agreement of the parties or further order of the Bankruptcy Court. Notwithstanding anything else in this paragraph or the Plan, the Mortgage Lender Designee may designate for rejection any executory contract within 3 days following the entry of an order of the Bankruptcy Court fixing the disputed cure amounts for such contract in which case such contract shall then be deemed to have been rejected as of the Confirmation Date.

8.2. **Claims for Damages**. All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases, if any, shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of Effective Date. Any and all proofs of claim with respect to Claims arising from the rejection of executory contracts by Owner shall be treated as Class 3 General Unsecured Claims, for purposes of distribution pursuant to the Plan. Any and all proofs of claim with respect to Claims arising from the rejection of executory contracts by Mezz Debtor and/or Holder shall be treated as Class 4 Other General Unsecured Claims, for purposes of distribution pursuant to the Plan. Unless otherwise permitted by Final Order, any proof of claim that is not filed before the Bar Date (other than those Claims arising from the rejection of executory contracts or leases under the Plan, which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Debtors, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, their Estates, or property of their estates.

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

9.1. **Conditions to Confirmation of the Plan**. The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by the Mortgage Lender Designee:

      (a) The Confirmation Order shall be in form and substance satisfactory to the Mortgage Lender and Mortgage Lender Designee, which Confirmation Order shall approve all provisions, terms and conditions of the Plan; and

      (b) No material amendments, modifications, supplements or alterations shall have been made to the Plan, any document contained in the Plan Supplement or any other document delivered in connection therewith, without the express written consent of the Mortgage

Lender and Mortgage Lender Designee, which consent may be granted, withheld, or conditioned in its sole discretion).

9.2. **Conditions to Effectiveness of the Plan**. The Plan shall not become effective unless and until (i) the Bankruptcy Court shall have entered the Confirmation Order by December 15, 2011 (or such other date as agreed to by Debtors and the Mortgage Lender Designee), the same shall be in full force and effect and not be subject to any stay or injunction and such Confirmation Order shall be in form and substance satisfactory to the Mortgage Lender Designee, and (ii) the Mortgage Lender Designee has closed on the LPA by, *inter alia*, paying Mortgage Lender $62,000,000 in aggregate consideration.

9.3. **Effect of Failure of Condition**. In the event that the conditions specified in section 9.2 of the Plan have not occurred on or before thirty (30) days after the Confirmation Date, the Confirmation Order shall be vacated upon order of the Bankruptcy Court upon motion made by the Mortgage Lender Designee.

9.4. **Notice of the Effective Date; Actions Taken on Effective Date**

(a)    The Debtors shall file a notice of the occurrence of the Effective Date within five (5) Business Days thereafter.

(b)    Unless otherwise specifically provided in the Plan, any action required to be taken by a Debtor on the Effective Date may be taken by such Debtor on the Effective Date or as soon as reasonably practicable thereafter.

## ARTICLE X

## RETENTION OF JURISDICTION

10.1. **Jurisdiction**. Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under this Plan have been made and performed by the Debtors, as the case may be, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a)    Claims. To determine the allowance, extent, classification, or priority of Claims against the Debtors upon objection by the Debtors or the Mortgage Lender Designee;

(b)    Injunction, etc. To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Case on or before the Effective Date with respect to any Person or Entity;

(c)     Professional Fees. To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the Effective Date, and objections thereto, as provided for in the Plan;

(d)     Certain Priority Claims. To determine the allowance, extent and classification of any Priority Tax Claims, Other Priority Claims, Administrative Claims or any request for payment of an Administrative Claim;

(e)     Dispute Resolution. To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and/or Confirmation Order and the making of distributions hereunder and thereunder;

(f)     Executory Contracts and Unexpired Leases. To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance and extent of any Claims resulting from the rejection of executory contracts and unexpired leases;

(g)     Actions. To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted (either before or after the Effective Date) in the Chapter 11 Cases by or on behalf of the Debtors;

(h)     General Matters. To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code or other applicable law;

(i)     Plan Modification. To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(j)     Aid Consummation. To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

(k)     Protect Property. To protect the Property of the Debtors from adverse Claims or Liens or interference inconsistent with this Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of this Plan;

(l)     Abandonment of Property. To hear and determine matters pertaining to abandonment of property of the Estates;

(m)     Implementation of Confirmation Order. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; and

(n)     Final Order. To enter a final order closing the Chapter 11 Cases.

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1. **Pre-Confirmation Modification**. On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender Designee.

11.2. **Post-Confirmation Immaterial Modification**. With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice to holders of Claims and Equity Interests, the Debtors may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender and the Mortgage Lender Designee.

11.3. **Post-Confirmation Material Modification**. On notice to and an opportunity to be heard, the Plan may be altered or amended after the Confirmation Date by the Debtors in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Mortgage Lender and the Mortgage Lender Designee.

11.4. **Withdrawal or Revocation of the Plan**. The Debtors, in consultation with the Mortgage Lender Designee and Mortgage Lender, reserve the right prior to the Effective Date to revoke or withdraw the Plan as to any Debtor or all Debtors and, in the event the Plan is withdrawn or revoked with respect one or more Debtors but not all Debtors, proceed with confirmation and/or consummation of the Plan with respect to any Debtor for which the Plan is not withdrawn. If the Debtors revoke or withdraw the Plan (as to all Debtors) or if confirmation or consummation of the Plan (as to all Debtors) does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the allowance, fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests) and any assumption or rejection of executory contracts or leases affected by the Plan shall terminate and be of no further force or effect, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person. In the event the Debtors revoke or withdraw the Plan as to a Debtor or Debtors (but not all Debtors) and proceed with confirmation and/or consummation of the Plan with respect to the Debtors(s) for which the Plan is not withdrawn, then nothing contained herein shall constitute or be deemed a waiver or release of any Claims against or Interests in such Debtor(s) withdrawn from the Plan or any other Person or to prejudice in any manner the rights of such

Debtor(s), the Mortgage Lender, the Mortgage Lender Designee, or any Person in any further proceedings involving such withdrawn Debtor(s).

11.5. **Payment of Statutory Fees**. All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) by the Debtors. The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. Section 1930(a)(6), plus interest due under 31 U.S.C. Section 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Cases, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7.

11.6. **Successors and Assigns**. The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

11.7. **Exculpation**. On the Effective Date, (a) the Debtors, and their direct and indirect parents, subsidiaries and affiliates, together with each of its present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) and (b) the Mortgage Lender Designee, the Released Parties, and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and shall be deemed released by all holders of Claims or Equity Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring through the date immediately preceding the Effective Date that arise from or are related to the Property and the ownership thereof, including, without limitation, any act or omission occurring during or relating to the Chapter 11 Cases, commencement of the Chapter 11 Cases, the solicitation of acceptances of this Plan, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

11.8. **Confirmation Injunction**. Except as otherwise provided herein, and as set forth in the Confirmation Order, (a) the rights afforded herein and the treatment of all Claims and Equity Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets and properties, (b) on the Effective Date, all such Claims against the Debtors and Equity Interests shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtors, their assets or properties, or any other or further Claims or Equity Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

11.9. **Comprehensive Settlement of Claims and Controversies**. Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or causes of action of (a) the Debtors and their Estates, including, without limitation, any Person or Entity seeking to exercise a right in a derivative capacity on behalf of the Estates, and (b) the Released Parties, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, their property and Claim and Equity Interest holders and is fair, equitable and reasonable. For the avoidance of doubt, the compromise and settlement of all claims and causes of action of the Debtors and their Estates as set forth herein shall include any potential avoidance actions accruing to the Debtors or their Estates, which shall not be pursued.

11.10. **Preservation of Insurance**. This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, their members, managers or officers) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

11.11. **Cramdown**. To the extent any Impaired Class of Equity Interest entitled to vote on the Plan votes to reject the Plan, the Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es), as well as with respect to Classes that are deemed to reject the Plan.

11.12. **Governing Law**. Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

11.13. **Notices**. Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

If to the Debtors:    216 West 18 Owner LLC
45 Adams Road
Easton, Connecticut 06612
Attention: Steven A. Carlson

with a copy to:    Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104
Attention: Lloyd A. Palans, Esq.

Michelle McMahon, Esq.

| | |
|---|---|
| If to Mortgage Lender Designee: | Atlas Capital Group, LLC<br>505 Fifth Avenue, 28th Floor<br>New York, NY 10017<br>Attention: Andrew B. Cohen |
| with a copy to: | Greenberg Traurig, LLP<br>MetLife Building<br>200 Park Avenue<br>New York, NY 10166<br>Attention: John H. Bae, Esquire<br>Gary D. Ticoll, Esquire |
| If to HAJ 18 LLC: | The Harsh Group<br>891 Second Avenue, 22nd Floor<br>New York, New York 10017<br>Attention: Harry Jeremias |
| with a copy to: | Herrick, Feinstein LLP<br>2 Park Avenue<br>New York, NY 10016<br>Attention: Jeffrey H. Kaufman, Esquire<br>Stephen B. Selbst, Esquire |
| If to Mortgage Lender: | 216 W 18 Lender LLC<br>c/o Fishman Holdings North America Inc.<br>950 3rd Ave., Suite 3101<br>New York, NY 10022<br>Attention: Yehuda Mor |
| with a copy to: | Alston & Bird LLP<br>1201 West Peachtree Street<br>Atlanta, Georgia 30309<br>Attention: Jason H. Watson, Esq.<br>David A. Wender, Esq. |

11.14. **Saturday, Sunday or Legal Holiday**. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

11.15. **Exemption From Transfer Taxes**. Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection

with this Plan, including, without limitation, the delivery of the Property to Mortgage Lender Designee and any other payments and transfers pursuant to the Plan by any Debtor(s) to Mortgage Lender Designee; delivery of deeds, bills of sale, or other transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

11.16. **Severability**. If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the option of the Mortgage Lender and the Mortgage Lender Designee, remain in full force and effect and not be deemed affected. However, the Mortgage Lender and the Mortgage Lender Designee reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.17. **Headings**. The headings used in this Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the provisions of the Plan.

**[The Remainder of the Page Intentionally Left Blank]**

## CONFIRMATION REQUEST

The Debtors hereby request confirmation of the Plan pursuant sections 1129(a) and (b) of the Bankruptcy Code.

DATED: September 26, 2011

**DEBTORS:**

**216 WEST 18 OWNER LLC,**
  **a Delaware limited liability company**

By: _/s/ Steven A. Carlson_
    Name: Steven A. Carlson
    Title: Chief Restructuring Officer

**216 WEST 18 MEZZ LLC,**
  **a Delaware limited liability company**

By: _/s/ Steven A. Carlson_
    Name: Steven A. Carlson
    Title: Chief Restructuring Officer

**216 WEST 18 HOLDER LLC,**
  **a Delaware limited liability company**

By: _/s/ Steven A. Carlson_
    Name: Steven A. Carlson
    Title: Chief Restructuring Officer

# EXHIBIT
# A

<u>MORTGAGE LOAN DOCUMENTS</u>

The documents listed below are dated as of April 17, 2007, unless otherwise indicated.

<u>Building Loan</u>

1.  Loan Agreement executed by Borrower, Bank and Borrower Principals.
2.  Promissory Note executed by Borrower.
3.  Mortgage executed by Borrower and Bank.
4.  Assignment of Leases and Rents.
5.  UCC-1 Financing Statement (Delaware Secretary of State).
6.  UCC-1 Financing Statement (New York County).
7.  Borrower's Certification executed by Borrower.
8.  Assignment and Subordination of Management Agreement executed by Borrower. Bank and the property manager described therein.
9.  Closing Instruction Letter executed by Borrower, Mezzanine Borrower (as defined in the Loan Agreement) and the title companies set forth therein.
10. Lender's Title Insurance Policy.
11. Collateral Assignment of Rate Cap Agreement.
12. 255 Affidavit.
13. Completion Guaranty.
14. Collateral Agreements Assignment of Construction Documents, Permits, Approvals and Other Related Documents.

<u>Acquisition Loan</u>

15. Loan Agreement executed by Borrower, Bank and Borrower Principals.
16. Promissory Note executed by Borrower.
17. Mortgage executed by Borrower and Bank.
18. UCC-1 Financing Statement (Delaware Secretary of State).
19. UCC-1 Financing Statement (New York County).
20. Borrower's Certification executed by Borrower.
21. Assignment and Subordination of Management Agreement executed by Borrower, Bank and the property manager described therein.
22. Lender's Title Insurance Policy.
23. Collateral Assignment of Rate Cap Agreement.
24. 255 Affidavit.
25. 275 Affidavit.
26. Interest and Operating Expenses Guaranty.

<u>Project Loan</u>

27. Loan Agreement executed by Borrower, Bank and Borrower Principals.
28. Promissory Note executed by Borrower.
29. Mortgage executed by Borrower and Bank.
30. Assignment of Leases and Rents.
31. UCC-1 Financing Statement (Delaware Secretary of State).

32. UCC-1 Financing Statement (New York County).
33. Borrower's Certification executed by Borrower.
34. Lender's Title Insurance Policy.
35. 255 Affidavit.

# EXHIBIT B

**218 WEST 18TH STREET**
**CHAPTER 7 LIQUIDATION ANALYSIS**

| | | |
|---|---|---|
| Cash On Hand | $568,971 | as of 8/31 |
| Tenant improvement allowance owed to SY Partners | ($225,783) | |
| Receiver fees owed | ($23,648) | as of 8/31 |
| Net Cash | $319,540 | |

| | | | |
|---|---|---|---|
| Value of Property: | | $62,300,000 | (1) |
| Transaction Discount under Chapter 7 Liquidation: | 10.0% | ($6,230,000) | (2) |
| Net Proceeds: | | $56,070,000 | |

| **TOTAL ASSETS:** | **$56,389,540** |
|---|---|

**Chapter 7 Fees and Expenses**

| | | |
|---|---|---|
| Trustee Commission | ($1,800,000) | (3) |
| **Total Fees and Expenses** | ($1,800,000) | |

| **NET DISTRIBUTABLE TO CLAIMHOLDERS** | **$54,589,540** |
|---|---|

| | | |
|---|---|---|
| Senior Tax Claims | $0 | |
| | | |
| Total Mortgage Lender Claim: | $73,254,968 | as of 8/31 |
| Distribution to Mortgage Lender: | ($54,589,540) | |
| Un-recovered Mortgage Lender Claim: | $18,665,427 | |
| | | |
| Total Owner General Unsecured Claims: | $2,593,853 | |
| Distribution to unsecured claims: | $0 | |
| | | |
| Recovery percentage - Mortgage Lender Claim: | 74.52% | (4) |
| Recovery percentage - Owner General Unsecured Claims: | 0.00% | (4) |

1) Based on CBRE appraisal. Standard prorations for income and expenses and payables/receivables are assumed to be included in this figure.

2) Includes discount to value associated with Chapter 7 liquidation, along with transaction costs related to the sale (including transfer taxes at 3.025% of the liquidation value)

3) Trustee commission pursuant to Section 326(a) of the Bankruptcy Code, based on the assumption that the property is sold to a third-party and that the Chapter 7 trustee distributes the proceeds to the mortgage lender. There would be additional legal fees and expenses associated with the appointment of the Chapter 7 trustee, which are not reflected here.

4) Under the plan, the Mortgage Lender will receive 84.33% of its claim in cash, and the Owner General Unsecured Claims will each receive 19.6% of their respective claims.

# EXHIBIT C

# HJ PLAN SUPPORT AGREEMENT

This HJ Plan Support Agreement (this "Agreement"), dated as of September _9_, 2011, is entered into between and among 18TH STREET OWNER LLC, a Delaware limited liability company ("Purchaser"), Harry Jeremias ("Jeremias"), HAJ 18 LLC, a Delaware limited liability company ("HAJ 18"), 216 West 18 Holder LLC, a Delaware limited liability company ("Holding"), 216 West 18 Mezz LLC, a Delaware limited liability company ("Mezz Borrower"), and 216 West 18 Owner LLC, a Delaware limited liability company ("Mortgage Borrower"; and together with Holding and Mezz Borrower, collectively, the "Debtors"). The Debtors, together with Purchaser, Jeremias and HAJ 18, are collectively referred to herein as the "Parties" and each a "Party").

## RECITALS

WHEREAS, Jeremias owns 100% of the limited liability company interest in HAJ 18, which in turn is the managing member of, and owns 47.8% of the limited liability company interest in, Holding, which owns 100% of the limited liability company interests in Mezz Borrower, which owns 100% of the limited liability company interests in Mortgage Borrower;

WHEREAS, concurrently herewith, Purchaser is entering into a loan purchase agreement (the "Sale Agreement") with 216 West 18 Lender LLC (the "Seller") to acquire either (a) the first mortgage loan (the "Mortgage Loan") secured by that certain real property commonly known as 216 West 18th Street, New York, New York (the "Property") and that certain mezzanine loan (the "Mezzanine Loan") secured by a pledge of 100% of Mezz Borrower's ownership interests in Mortgage Borrower (collectively, the "Loans") or (b) both the Loans and the Property in the event a Qualified Plan (as hereinafter defined) is confirmed;

WHEREAS, the Sale Agreement and this Agreement contemplate that Purchaser, Jeremias, HAJ 18 and the Debtors will agree upon the terms of a bankruptcy plan for the Debtors and, at Purchaser's direction, the Debtors will commence voluntary cases (the "Chapter 11 Cases") under chapter 11, title 11, the United States Code, 11 U.S.C. section 101 _et seq._ (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and a disclosure statement, both of which will provide for, among other things, (i) the transfer of the Property to Purchaser; (ii) distributions on account of unsecured claims against the Debtors in the amount of 19.6%, or such other amount as may be agreed to by Purchaser; and (iii) the cancellation of the existing equity in the Debtors; and (iv) the Debtors' absolute release of the Seller and its predecessor in interest for all matters relating to the Property and/or the Loans (a "Qualified Plan");

WHEREAS, contemporaneously with the execution of this Agreement and the Sale Agreement, Purchaser has deposited in immediately available funds the sum of $2,000,000.00 (the "Initial Deposit") with Levy Holm Pellegrino and Drath LLP ("Escrow Agent") to be held and disbursed in accordance with the terms and conditions of the Sale Agreement;

WHEREAS, the Initial Deposit shall be disbursed to Seller as liquidated damages should Purchaser terminate the Sale Agreement in accordance with and pursuant to the terms and conditions of the Sale Agreement during the thirty (30) day period immediately following the execution of the Sale Agreement (the "Due Diligence Period");

WHEREAS, if Purchaser has not terminated the Sale Agreement during the Due Diligence Period, then Purchaser shall post an additional $10,400,000.00 with Escrow Agent (the "Second Deposit" and, collectively with the Initial Deposit, the "Deposit") in accordance with and pursuant to the terms and conditions of the Sale Agreement; and

WHEREAS, on the earlier to occur of (x) the effective date of a Qualified Plan, and (y) 120 days after the expiration of the Due Diligence Period, the Purchaser shall acquire the Property in the case of confirmation of a Qualified Plan or if a Qualified Plan has not been confirmed, acquire the Loans and all of the Seller's rights, claims and causes of action of Seller with respect to the Loans ("Senior Claims").

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2.    Plan Support Covenants. Harry, HAJ 18 and each of the Debtors (collectively, the "HJ Group") hereby covenant and agree to perform and comply, and to cause their respective agents, affiliates and employees to perform and comply with the following obligations:

(a)    Each member of the HAJ Group shall use their respective good faith, diligent and best efforts to promote, support and cause the solicitation of a Qualified Plan, and, the preparation and at Purchaser's election, filing of the Chapter 11 Cases, and, unless instructed otherwise by Purchaser in writing, to promote, support and cause the confirmation and consummation of a Qualified Plan;

(b)    Not take any steps to disrupt, impede or otherwise interfere with the Chapter 11 Cases, or object to the confirmation of a Qualified Plan or otherwise take any action or commence any proceeding to oppose or, unless otherwise instructed by Purchaser, seek any modification of a Qualified Plan, the disclosure statement related to a Qualified Plan, or any other reorganization documents containing terms and conditions consistent in all material respects with the Qualified Plan and this Agreement;

(c)    Provide Purchaser with drafts of all filings in the Chapter 11 Cases prior to the filing thereof and, to the extent not inconsistent with Section 23 hereof, incorporate Purchaser's reasonable comments to all such filings;

(d)    Not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of: (i) any chapter 11 plan for any of the Debtors other than a Qualified Plan described above and approved by Purchaser, or (ii) any other restructuring or reorganization for, or the liquidation of, any of the Debtors (directly or indirectly), HAJ 18, or Jeremias, other than a Qualified Plan;

(e)    Negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of a Qualified Plan;

(f)     Not support any party adverse to Bank of America, N.A. (the "Bank"), Seller or Purchaser or affirmatively interfere, take any affirmative steps, or directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of any affirmative action or otherwise in that certain foreclosure action entitled *Mortgage Electronic Registration Systems, Inc., as nominee of Bank of America, N.A. v. 216 West 18 Owner LLC, et al.,* Index No. 650622/2009, and that other certain action on guaranties entitled *216 W 18 Lender LLC vs. Harry Jeremias and Tsvi Pluczenik,* Index No. 652415/2010 in Supreme Court of the State of New York, County of New York (collectively, the "Litigation");

(g)     Not to take any action contrary to the transaction contemplated by the terms of this Agreement and the Sale Agreement;

(h)     If confirmation of the Qualified Plan is abandoned at the request of Purchaser, in its sole discretion, and Purchaser in lieu thereof, desires to seek to acquire the Property by foreclosure or deed in lieu thereof, then the HJ Group shall and shall cause their affiliates and agents to use good faith, diligent and best efforts to support an orderly transfer of the Property or the Loans and Senior Claims, as the case may be, to Purchaser and shall not raise any defenses or impediments to same. The provisions of this Section 2(g) shall survive the termination of this Agreement;

(i)     Not directly or indirectly attempt to delay, set aside, void or otherwise challenge the transfer of the Property to Purchaser, Seller of any of their respective assigns or nominees, whether pursuant to a Qualified Plan, foreclosure or otherwise;

(j)     Not take any action which would directly or indirectly impede, interfere with, delay or seek to set aside the sale of all right, title and interest of Seller and/or Purchaser in and to the Loan together with all claims, causes of actions and rights of Seller and/or Purchaser under the Litigation and Purchaser's and/or Seller's rights and interest under the Chapter 11 Cases; and

(k)     Comply with each of the obligations in this Section 2, which relate to the Mortgage Loan, with regard to any foreclosure action in connection with the Mezzanine Loan with the same effect.

3.      Releases.

Simultaneously with the Purchaser's posting of the Initial Deposit, the documents described in this Section 3 (collectively the, "HJ Escrowed Documents") shall be executed and delivered to Escrow Agent and held pursuant to the terms and conditions of that certain escrow agreement dated as of the date hereof between Escrow Agent, Seller, Purchaser, Jeremias and HAJ 18 (the "HJ Escrow Agreement"):

(a)      A dismissal and release by Jeremias, HAJ 18, Borrower, Mezz Borrower, Holding, of all counterclaims in all pending litigations with prejudice and judgment thereon, and a general release with prejudice, and covenant not to sue any of the Bank, Seller and the Referee and each of their respective members, affiliates, officers, directors, employees, shareholders, partners, attorneys and agents for any matters arising out of or in any way related to the Loans, the Property or in connection with such counterclaims, such release to be in a form satisfactory to Seller, the Bank and Purchaser (the "Lender Release");

(b)      A stipulation of dismissal and release of all claims by Borrower, Mezz Borrower and HJ in the Litigation with prejudice and with costs to be borne by the respective parties; a withdrawal with prejudice of Borrower's notice of appeal filed on December 15, 2010 and dated December 13, 2010; and two alternative stipulations agreeing to the calculation of the indebtedness under the Foreclosure Action (collectively, the "Stipulations"); and

(c)      A dismissal and release by Seller of all claims it has or may have under the interest and operating expense guaranty, completion guaranty or otherwise with respect to the Loans which shall not be effective until 91 days after the transfer of the property to Purchaser, Seller or their respective nominees and/or assigns pursuant to a Qualified Plan or by foreclosure (the "Conditional HJ Release"). Notwithstanding the foregoing, in the event that HJ (or any affiliate, employee or agent of HJ) breaches this Agreement at any time prior to the date of the first day of the second month after the first anniversary of the transfer of the Property to Purchaser, Seller and/or any assignee or nominee of either of them, the Conditional HJ Release shall be rescinded and *void ab initio*.

Pursuant to the HJ Escrow Agreement, Escrow Agent shall hold and deliver the HJ Escrowed Documents in accordance with the terms of the HJ Escrow Agreement. In the event that the Second Deposit is not timely posted, the the Escrowed Documents will all be destroyed or returned to the parties that executed them and all such instruments will be void and ineffective for all purposes.

4.    Chief Restructuring Officer/Cooperation.  If Purchaser elects not to terminate the Sale Agreement or waives its right to terminate the Sale Agreement during the Due Diligence Period and delivers the Second Deposit to the Escrow Agent in accordance with and pursuant to the terms and conditions of the Sale Agreement, then in connection with the Qualified Plan, HJ and Purchaser will appoint an independent director for the Debtors, who will act as the chief restructuring officer ("CRO") for the Debtors.  HJ shall and shall cause the Debtors to cooperate at all times with the CRO, Seller and Purchaser in the solicitation of votes on the Qualified Plan. Jeremias and HAJ 18 shall also cause their respective affiliates, employees and/or agents, as applicable, to not take any steps to interfere, delay or in any way disrupt the approval of a Qualified Plan and the Chapter 11 Cases for the Debtors.

5.    Termination.  This Agreement shall terminate and all obligations of the parties hereunder shall immediately terminate and be of no further force and effect (other than those obligations and liabilities expressly stated to survive the termination of this Agreement) in the event of the termination of the Sale Agreement during the Due Diligence Period. Upon any termination of this Agreement in accordance with the terms of Section 5(a), this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, there shall be no liability or obligation on the part of any Party other than those obligations and liabilities expressly stated to survive the termination of this Agreement and, in accordance with the terms of the HJ Escrow Agreement, the HJ Release shall be returned to HJ and the Seller Release shall be returned to Seller.

6.    Excess Cash.  In the event there is any remaining cash in the Debtors' estates following the Purchaser's acquisition of the Property or Loans pursuant to confirmation of a

Qualified Plan or by foreclosure or deed in lieu thereof, such cash shall revert to the Purchaser in accordance with the terms of the Sale Agreement.

7.      Co-Investment Right.  Upon and at the closing of the Sale Agreement (the "Closing Date") should it occur, HAJ 18 shall have the right (the "Co-Investment Right") to acquire a non-managing membership interest in either the managing member of Purchaser, or if Purchaser is a single member limited liability company, to invest in the managing member of the single member (the "Sole Member") of Purchaser (such entity, the "Managing Member"), upon and subject to the terms and conditions specified in this Section 7.  The managing member of the Managing Member will be an affiliate of Atlas Capital Group LLC ("Atlas").  Atlas, HAJ 18 and the other members of the Managing Member are referred to herein collectively as the "Members" and each a "Member".

(a)      Admission Amount of Initial Contribution.  On the Closing Date, HAJ 18 will make a contribution, by wire transfer of immediately available funds, to the Managing Member in an amount (such amount, the "Required Initial Contribution") equal to: (i) 33.333% of all capital contributed by Managing Member to Purchaser or Sole Member, as the case may be, including amounts contributed, or to be contributed, on the Closing Date, minus (ii) $350,000.00 (the "Credit").  If HAJ 18 fails to make the Required Initial Contribution in full on the Closing Date, then the Co-Investment Right (including HAJ 18's right to the benefit of the Credit) shall terminate and be void ab initio.  In the event that HAJ 18 contributes the Required Initial Contribution in full, by wire transfer of immediately available funds, on the Closing Date, then HAJ 18 will be admitted as a non-managing member of the Managing Member, with an initial deemed capital account balance equal to the Required Initial Contribution plus the Credit, and a 33.333% percentage interest (the "HAJ 18 Percentage") in Managing Member, all upon and subject to the following terms and conditions:

(i)      Management & Control.  HAJ 18 will have no voting, control or other management rights or authority with respect to Managing Member, Sole Member, or Purchaser, provided, however, Atlas may not, without the prior written consent of HAJ 18, consent to, approve of, enter into, or consummate: (1) any modification to the distribution priority waterfall under the operating agreements of Purchaser, Sole Member or Managing

Member in a manner that is materially adverse to HAJ 18; (2) any agreement or transaction between Atlas or an affiliate thereof, on the one hand, and Purchaser, the Sole Member, or Managing Member, on the other hand; or (3) any agreement or transaction between Purchaser, the Sole Member of Purchaser, or Managing Member on the one hand, and any third party on the other hand, in which Atlas (or any affiliate of Atlas) receives a direct or material indirect economic benefit or opportunity that is not shared pro rata with the other members of Managing Member. HAJ 18 hereby irrevocably consents to and agrees that: (i) an affiliate of Atlas shall be the Property Manager for the Property (the "Atlas Property Manager") and HAJ 18 shall not be entitled to any share of the fees paid ("Property Management Fees") paid to the Atlas Property Manager so long as such fees are commercially reasonable; and (iii) an affiliate of Atlas shall be the asset manager (the "Atlas Asset Manager") and HAJ 18 shall be entitled to its pro rata shares of any Fees ("Asset Management Fees") received by the Atlas Asset Manager. Except as otherwise required by any non-waivable provision of the Delaware Limited Liability Company Act, (the "Act"), none of Atlas, HAJ 18, the Members, nor any other direct or indirect member of the Sole Member, or Purchaser, shall: (a) have fiduciary duty liability to any other member or any other person or entity; (b) be personally liable in any manner whatsoever for any debt, liability or other obligation of the Managing Member, or Purchaser, whether such debt, liability or other obligation arises in contract, tort, or otherwise. The foregoing shall not, in any manner, restrict, limit or prohibit Atlas (or any of its affiliates, principals or employees) from entering into transactions unrelated to the Property or require Atlas to offer Jeremias, HAJ 18 (or the members thereof) the opportunity to invest in the same.

(ii)     Economics.  HAJ 18 will be entitled to receive distributions of all amounts subsequently distributed by Managing Member to Atlas and the other Members, (including, without limitation, any so called "promote" distributions) on a *parri passu* basis, (each in proportion to their respective capital account balances, subject to dilution as provided below) provided, however, that once all direct and indirect investors in Purchaser (other than HAJ 18) have achieved a 20% IRR, HAJ 18 will be entitled to a special distribution of $500,000.00 to the extent the Property generates sufficient net cash flow before any further distributions to any of the other investors. As used herein, "IRR" means as of any date of a cash distribution to any one or more investor, a specified internal rate of return that, when used as a discount rate, causes the net present value of the cumulative distributions made to such investor

to equal the net present value of the capital contributions funded by such investor. For purposes of this definition, (i) net present value shall be determined using quarterly compounding periods, and (ii) each capital contribution funded by an investor shall be deemed made, and each distribution of cash (including any return of a capital contribution) received by such investor on account of capital contributions shall be deemed to have been received, as of the end of the month in which it was actually received. In addition, HAJ 18 will be entitled to receive its pro rata share (based upon its percentage interest in Managing Member) of any Asset Management Fee (but not any Property Management Fee or – subject to Section 7(i) – other fees) paid to Atlas Capital Group LLC or any affiliate thereof in connection with the Property.

(iii) Additional Contributions. In the event that, following the Closing Date, Managing Member agrees to or is required to make any additional capital contribution (a "Discretionary Additional Capital Contribution") to Purchaser or the Sole Member, as the case may be, for any cost or expense other than an Emergency Expense (herein defined), then HAJ 18 may, but shall not be required, to fund its pro rata share of such Discretionary Additional Capital Contribution. In the event that HAJ 18 fails to fund its pro rata share of any Discretionary Additional Capital Contribution, then Atlas and/or any of the other Members shall have the right to make such contribution on HAJ 18's behalf, in which event, HAJ 18's percentage interest in Managing Member will be diluted on a non-punitive 1 to 1 basis. As used herein, "Emergency Expenses" shall mean funds necessary for the Purchaser or the Sole Member to avoid, mitigate, remediate, cure or prevent: (i) an imminent risk of damage to persons or property, (ii) a violation of law, or (iii) a breach under any loan document or other material agreement to which Purchaser or the Sole Member is party or bound. In the event that, following the Closing Date, Managing Member agrees to, or is required, to make any additional capital contribution to Purchaser or the Sole Member, as the case maybe, for Emergency Expenses (an "Emergency Capital Contribution"), then each of Atlas, HAJ 18 and the other Members will be required to fund their respective pro rata share of such Emergency Capital Contribution. In the event HAJ 18 that any other Member (the "Non-Contributing Member") fails to fund its share of any Emergency Capital Contribution within five (5) days, any other Member (the "Contributing Member") may, in its sole discretion, advance all or any portion of the Non-Contributing Member's share of the Emergency Capital Contribution, which advance will be treated as a loan by the Contributing Member to the Non-Contributing Member (a "Member Loan"), which will earn interest at an

annual rate, compounded monthly, equal to the lesser of (i) the maximum rate of interest allowed by applicable law, and (ii) twenty percent (20%). If the Non-Contributing Member does not repay a Member Loan, including any accrued and unpaid interest thereon (any such interest, "Member Loan Interest"), within forty-five (45) days following the date the Contributing Member made the Member Loan, then the Contributing Member may, at any time and from time to time thereafter prior to its repayment, in its sole discretion, elect to have all or any portion of the unpaid amount of the Member Loan together with all interest thereon (the amount so converted, the "Converted Amount") treated as an Additional Capital Contribution to the Managing Member by the Contributing Member (the date of such election, the "Conversion Date"). If the Contributing Member makes such an election (a "Conversion Election"), then: an amount equal to two (2) times the Converted Amount shall be treated as an Additional Capital Contribution by the Contributing Member as of the date such Contributing Member make the Conversion Election; (D) the percentage interest of the Contributing Member shall be increased by an amount equal to the percentage determined by dividing (I) the Converted Amount multiplied by two (2), by (II) the total Capital Contributions made or deemed made by all the Members to the Managing Member on or prior to the Conversion Date, provided that for the avoidance of doubt any Capital Contributions that were also Converted Amounts, shall be multiplied by two (2) for purposes of calculating such total Capital Contributions (and provided such Member's percentage interest shall not exceed one hundred percent (100%)); and (E) the percentage interest of the Non-Contributing Member shall be reduced by the percentage determined under clause (D) (provided such member's Percentage Interest shall not be reduced below zero percent (0%)).

(iv)     Right of First Offer. In the event that Atlas cause the Managing Member to elect to exercise any right of first offer or "buy/sell" right or similar right that Manging Member has under the Operating Agreement of the Purchaser or the Sole Member to purchase the Property or the interest of the other members of Purchaser – which election may be made or declined by Atlas without the consent of HAJ 18 – then, HAJ 18 shall have the option either to: (i) contribute its pro rata share of the cost to Managing Member to purchase such interest or exercise such right of first offer; or (ii) decline to contribute such amount. If HAJ 18 declines to contribute such amount shall be treated as a Discretionary Additional Capital Contribution.

(v)    Transfers. Jeremias may, at any time, transfer up to 66.66% of his interest in HAJ 18 without the consent of Atlas or the other Members, provided, however, at all time Jeremias most own 31% of HAJ 18 and either Jeremias or Judah Klein must control HAJ 18. In the event there is more than one (1) member of HAJ 18, then Atlas will, upon receipt of a written request, it believes in good faith, executed by all of the members of HAJ 18 (a "HAJ Disbursement Direction"), cause any distributions or other amounts otherwise payable to HAJ 18 to be payable directly to the members of HAJ 18 in such proportion as expressly indicated on such HAJ Disbursement Direction and the same shall be deemed a distribution or payment to HAJ 18. Atlas shall have no liability whatsoever for acting in a manner that, in its good faith elieves to be consistent with a HAJ Disbursement Direction and shall be indemnified by HAJ 18, Jeremias and all other members of HAJ 18 with respect thereto. Any HAJ 18 Disbursement, once delivered, may not be rescinded, modified or waived absent the written agreement of all members of HAJ 18.

(b)    Definitive Agreement.    Promptly after HAJ 18's investment of the Required Initial Contribution, the parties shall negotiate in good faith to enter into a definitive amended and restated operating agreement for Managing Member reflecting the above terms and such other terms and conditions as are customary and standard in such agreements, provided, however, until such time as a definitive agreement is executed and delivered by the parties, the rights of HAJ 18 shall be governed by the terms of this Section 7.

(c)    Waiver or Loss of Co-Investment Right.  In the event that: (i) at any time on or prior the Closing Date, a material default shall occur under this Agreement; (ii) the Sale Agreement terminates, for any reason (including a default or election by Purchaser), prior to the Closing or (iii) HAJ 18 fails to its Required Initial Contribution on the Closing Date; or (iii) an Alternative Disposition (herein defined) shall occur and HAJ 18 receives HJ's Profit Share (as herein defined), if any, then, in any such event, the Co-Investment Right (including HAJ 8's right to the benefit of the Credit) shall terminate and be void *ab initio* and of no force, effect or consequence and neither Jeremias nor HAJ 18 nor any will be entitled to any damages compensation on account thereof.

Jeremias and HAJ 18 each expressly acknowledge and agree that, although it is presently contemplated that Managing Member will hold a 20% indirect interest in Purchaser on the Closing Date, the Managing Member's actual percentage interest, directly or indirectly, in Purchaser has not ultimately been determined and may vary between the date hereof and either the Closing Date or the date of an Alternative Disposition, and no representation or warranty has been made or given concerning what such percentage will be and the rights of HAJ 18 hereunder with respect to its Co-Investment Right or AD Profit Share (herein defined) will not modify or change in the event that the Managing Member's percentage interest in Purchaser is either greater than or less than 20%, nor shall HAJ 18 or Jeremias or any other person be entitled to any additional compensation on account thereof

8.    Profit Sharing on Alternative Dispositions.  As used herein, an "Alternative Disposition" shall mean the occurrence of the following provided that no material default shall have occurred hereunder as of such date: (i) the assignment by Purchaser of its interest in the Sale Agreement to a third party prior to the Closing Date (a "Flip"); (ii) the occurrence of a foreclosure of the Property in which the Purchaser is not the prevailing bidder; or (iii) the confirmation of Bankruptcy Plan of the Debtors (over the objection of the Debtors) other than a Qualified Plan that results in a payment to Purchaser on account of the Senior Claims.  In the event that an Alternative Disposition occurs and Purchaser actually receives and collects any payment in connection with the same (such amount, "Alternative Disposition Funds"), then such Alternative Disposition Funds shall be distributed and allocated as follows:  (i) first,  to Purchaser until it has received an amount equal to all costs and expenses incurred or expended by it (or any of its affiliates) in connection with the transaction contemplated by this Agreement, including, without limitation, legal fees, transfer taxes, title insurance charges and the Deposit (collectively, "Purchaser Total Investment"); and (ii) second, to Purchaser until each direct or indirect investor in Purchaser has achieved a 16% IRR.  The balance, if any, of the Alternative Disposition Funds, after the distributions contemplated in (i) and (ii) above is referred to herein as (the "AD Profit").  The portion of the AD Profit, if any, payable to the Managing Member is referred to herein as the "MMAD Profit".  If and to the extent that if any MMAD Profit  is actually received by Managing Member in respect to any Alternative Disposition other than a Flip, HAJ 18 will be entitled to 33.333% of the MMAD Profit, and if and to the extent any MMAD Profit is actually received by Managing Member in respect to a Flip, HAJ 18 will be

entitled to the lesser of all such MMAD Profit and $500,000.00 thereof plus 33.333% of any MMAD Profit in excess of $500,000.00 (the "AD Profit Share").

9.  Modification of Agreement.  No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by each of the Parties hereto.

10.  Representations and Warranties of the Parties.  Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)  Power and Authority.  Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b)  Authorization.  The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c)  Binding Obligation.  Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

11.  Effectiveness.  This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

12.  Counterparts.  This Agreement may be executed in any number of counterparts each of which when so executed and delivered shall be deemed to be an original, but all such counterparts shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic format shall be equally as effective as delivery of a manually executed counterpart of this Agreement.

13.  Governing Law; Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that

might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

14.     _Headings_. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

15.     _Specific Performance_. It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

16.     _Prior Negotiations_. This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

17.     _No Third-Party Beneficiaries_. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.     _Severability_. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

19.     _Rights and Remedies_. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

20.     _Successors and Assigns_. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

21. <u>Notices</u>. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

    (a)    <u>If to the Purchaser, to:</u>

> Atlas Capital Group
> 505 Fifth Avenue
> 28th Floor
> New York, New York 10017
> Attention: Andrew B. Cohen
> Tel: 212-554-2260
> Fax: 212-554-2263
> Email: acohen@atlas-cap.com
>
> With a copy to:
>
> Greenberg Traurig, LLP
> MetLife Building
> 200 Park Avenue
> New York, New York 10166
> Attention: John Bae, Esq.
>           David Bolen, Esq.
> Tel: 212-801-6774
> Fax: 212-801-6400
> Email: baej@gtlaw.com
>        bolend@gtlaw.com

    (b)    <u>If to any member of the HJ Group, to:</u>

> Harry Jeremias
> c/o The Harsh Group
> 891 Second Avenue, 22nd Floor
> New York, New York 10017
> Tel: 212.725.6481
> Fax: 212.725.6480
> Email: Harry@HARCHgroup.com

with a copy to:

Jeffrey H. Kaufman, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Tel.: 212.592.1409
Fax: 212.545.3345
jkaufman@herrick.com

22.     Representation by Counsel. Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

23.     Fiduciary Out. Notwithstanding any provision of this Agreement to the contrary, nothing set forth herein shall require Jeremias or HAJ 18 to breach their fiduciary duties, if any, to creditors in connection with a Qualified Plan.

*[signature page follows]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**HJ:**

_____

Harry Jeremias, individually

**HAJ 18 LLC**

By: _____
     Name: Harry Jeremias
     Title: Manager

By: _____
     Name: Harry Jeremias
     Title: Manager

**PURCHASER:**

**18TH STREET OWNER LLC**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**DEBTORS:**

**216 WEST 18 MEZZ LLC**

By: _____
     Name: Harry Jeremias
     Title: President

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**HJ:**

_____

Harry Jeremias, individually

**HAJ 18 LLC**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**PURCHASER:**

**18TH  STREET OWNER LLC**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**DEBTORS:**

**216 WEST 18 MEZZ LLC**

By: _____
     Name:
     Title:

**216 WEST 18 OWNER LLC**

By: _____
    Name: Harry Jeremias
    Title: President

**216 WEST 18 HOLDER LLC**

By: _____
    Name: Harry Jeremias
    Title: President


CONSENTED TO AS OF THE DATE FIRST
ABOVE WRITTEN:

216 WEST 18 LENDER LLC


By: _____
    Name:   Yehuda Mor
    Title:   Authorized Signatory

By: _____
    Name:   Steven Holm
    Title:   Authorized Signatory

**216 WEST 18 OWNER LLC**

By: _____
       Name:
       Title:

**216 WEST 18 HOLDER LLC**

By: _____
       Name:
       Title:

CONSENTED TO AS OF THE DATE FIRST
ABOVE WRITTEN:

216 W 18 LENDER LLC

By: _____
    Name:   Yehuda Mor
    Title:   Authorized Signatory
By: _____
    Name:   Steven Holm
    Title:   Authorized Signatory

# EXHIBIT D

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September \_\_, 2011, is entered into by and among Aura Electrical Supply Inc. ("Aura") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Aura and the Debtors are herein referred to as the "Parties."

### RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Aura holds a claim in the amount of $120,000.00 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2. Plan Support. Aura agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Aura, to perform and comply with the following obligations, as applicable:

(a) Aura will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be proposed by the Debtors or (ii) any other restructuring or reorganization for, or the

liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

(b) Aura will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

(c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided, however,* that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

3. <u>Satisfaction of the Claim</u>. Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $23,520.00 to Aura (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Aura shall have no further recourse against the Debtors or interest in the Debtors' estates.

4. <u>Transfer Restriction</u>. Aura shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

5. <u>Termination</u>.

(a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

(i)     with the mutual written consent of Aura and the Debtors at any time;

(ii)     if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

(iii)     if the Court denies confirmation of a Qualified Plan;

(iv)     if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

(v)     any of the Chapter 11 Cases is dismissed;

(vi)     if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an order confirming any plan of reorganization for the Debtors other than a Qualified Plan.

NY 241,440,309v2 9-12-11

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. <u>Modification of Agreement</u>. No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Aura.

7. <u>No Solicitation</u>. Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. <u>Representations and Warranties of the Parties</u>. Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority</u>. Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) <u>Authorization</u>. The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) <u>Binding Obligation</u>. Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. <u>Effectiveness</u>. This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

NY 241,440,309v2 9-12-11

11. Headings. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. Specific Performance. It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. Prior Negotiations. This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. Rights and Remedies. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

    a.    If to the Debtors:

> Harry Jeremias
> The Harsh Group
> 891 Second Avenue, 22nd Floor
> New York, New York 10017
> Tel: 212.725.6481
> Fax: 212.725.6480

- 4 -

Email: Harry@HARCHgroup.com

with a copy to:

Jeffrey H. Kaufman, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Tel.:212.592.1409
Fax: 212.545.3345
jkaufman@herrick.com

b.  If to Aura:

Aura Electrical Supply Inc.
Attn: Heshy Kaszirer
1355 60th Street
Brooklyn, NY 11219
Tel: 718.475.7750
Fax: 718.436.6645
Email: henry@aura-electric.com

with a copy to:

Harry L. Klein, Esq.
26 Court Street
Brooklyn, NY 11242
Tel: 718-852-5266
Fax:718-852-5838
E-mail: HLKESQ@aol.com

19. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. Representation by Counsel. Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

NY 241,440,309v2 9-12-11

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

AURA ELECTRICAL SUPPLY INC.

By: _____

Name: HEMP KASLIR

Title: V.P.


216 WEST 18 HOLDER LLC, 216 WEST 18 MEZZ LLC AND 216 WEST 18 OWNER LLC

By: _____

Name:

Title:

NY 241.440,309v2 9-12-11

# EXHIBIT E

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September **8**, 2011, is entered into by and among Wonder Works Construction Corp. ("Wonder Works") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Wonder Works and the Debtors are herein referred to as the "Parties."

### RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Wonder Works holds a claim in the amount of $1,203,920.51 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2. Plan Support. Wonder Works agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Wonder Works, to perform and comply with the following obligations, as applicable:

(a) Wonder Works will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be

proposed by the Debtors or (ii) any other restructuring or reorganization for, or the liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

(b) Wonder Works will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

(c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided, however*, that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

3. <u>Satisfaction of the Claim</u>. Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $236,000 to Wonder Works (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Wonder Works shall have no further recourse against the Debtors or interest in the Debtors' estates.

4. <u>Transfer Restriction</u>. Wonder Works shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

5. <u>Termination</u>.

(a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

(i)     with the mutual written consent of Wonder Works and the Debtors at any time;

(ii)     if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

(iii)     if the Court denies confirmation of a Qualified Plan;

(iv)     if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

(v)     any of the Chapter 11 Cases is dismissed;

(vi)     if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an

order confirming any plan of reorganization for the Debtors other than a Qualified Plan).

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. Modification of Agreement. No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Wonder Works.

7. No Solicitation. Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. Representations and Warranties of the Parties. Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) Power and Authority. Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) Authorization. The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) Binding Obligation. Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. Effectiveness. This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. Governing Law; Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court

will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

11. Headings. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. Specific Performance. It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. Prior Negotiations. This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. Rights and Remedies. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

a. If to the Debtors, to:

Harry Jeremias
The Harsh Group
891 Second Avenue, 22nd Floor

New York, New York 10017
Tel: 212.725.6481
Fax: 212.725.6480
Email: Harry@HARCHgroup.com

with a copy to:


b.  If to Wonder Works, to:

Wonder Works Construction Corp.
Attn: Joseph Klayberg
18 West 21st St., 4th Floor
New York, NY 10010
Tel: 212.465.8455
Fax: 212.268.9370
Email: jklaynberg@wwccorp.com

with a copy to:

Tsyngauz & Associates, P.C.
Attn: Yevgeny Tsyngauz
18 West 21 Street, 3rd floor
New York, NY 10010
Tel: 212-337-9770
Fax: 212-337-9774
E-mail: yt@nytlaw.com


19. Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. Representation by Counsel.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

WONDER WORKS CONSTRUCTION CORP.

By:

Name:
Title:


216 WEST 8 HOLDER LLC, 216 WEST 18 MEZZ LLC AND 216 WEST 18 OWNER LLC

By:

Name:
Title:

# EXHIBIT F

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September 8, 2011, is entered into by and among Eastern Air, Inc. ("Eastern") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Eastern and the Debtors are herein referred to as the "Parties."

### RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Eastern holds a claim in the amount of $115,675.00 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2. Plan Support. Eastern agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Eastern, to perform and comply with the following obligations, as applicable:

(a) Eastern will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be proposed by the Debtors or (ii) any other restructuring or reorganization for, or the

liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

 (b) Eastern will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

 (c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided, however,* that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

 3. <u>Satisfaction of the Claim</u>. Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $22,672.30 to Eastern (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Eastern shall have no further recourse against the Debtors or interest in the Debtors' estates.

 4. <u>Transfer Restriction</u>. Eastern shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

 5. <u>Termination</u>.

 (a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

  (i) with the mutual written consent of Eastern and the Debtors at any time;

  (ii) if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

  (iii) if the Court denies confirmation of a Qualified Plan;

  (iv) if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

  (v) any of the Chapter 11 Cases is dismissed;

  (vi) if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an order confirming any plan of reorganization for the Debtors other than a Qualified Plan.

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. <u>Modification of Agreement</u>. No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Eastern.

7. <u>No Solicitation</u>. Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. <u>Representations and Warranties of the Parties</u>. Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority</u>. Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) <u>Authorization</u>. The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) <u>Binding Obligation</u>. Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. <u>Effectiveness</u>. This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

NY 241,421,304v3 9-1-11

11. Headings. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. Specific Performance. It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. Prior Negotiations. This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. Rights and Remedies. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

      a.    If to the Debtors:

          Harry Jeremias
          The Harsh Group
          891 Second Avenue, 22nd Floor
          New York, New York 10017
          Tel: 212.725.6481
          Fax: 212.725.6480

Email: Harry@HARCHgroup.com

with a copy to:

b.   If to Eastern:

Eastern Air, Inc.
Attn: [name]
260 Johnson Avenue
Brooklyn, NY 11206
Tel: 718.821.3636
Fax: 718.8219104
Email: [e-mail]

with a copy to:

19. Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. Representation by Counsel.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

*[signature page follows]*

EASTERN AIR , INC.

By: _____

Name: MESNILININI

Title: V. PRESIDENT.


216 WEST 8 HOLDER LLC, 216 WEST 18 MEZZ
LLC AND 216 WEST 18 OWNER LLC

By: _____

Name:

Title:

# EXHIBIT G

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September _8_, 2011, is entered into by and among Ramapo Lighting and Electric ("Ramapo") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Ramapo and the Debtors are herein referred to as the "Parties."

## RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Ramapo holds a claim in the amount of $187,650.00 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. _Recitals Incorporated_. The recitals set forth above are incorporated herein by reference.

2. _Plan Support_. Ramapo agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Ramapo, to perform and comply with the following obligations, as applicable:

(a) Ramapo will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be proposed by the Debtors or (ii) any other restructuring or reorganization for, or the

liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

(b) Ramapo will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

(c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided, however,* that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

3. <u>Satisfaction of the Claim</u>. Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $36,779.40 to Ramapo (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Ramapo shall have no further recourse against the Debtors or interest in the Debtors' estates.

4. <u>Transfer Restriction</u>. Ramapo shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

5. <u>Termination</u>.

(a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

(i)      with the mutual written consent of Ramapo and the Debtors at any time;

(ii)     if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

(iii)    if the Court denies confirmation of a Qualified Plan;

(iv)     if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

(v)      any of the Chapter 11 Cases is dismissed;

(vi)     if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an order confirming any plan of reorganization for the Debtors other than a Qualified Plan.

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. Modification of Agreement. No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Ramapo.

7. No Solicitation. Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. Representations and Warranties of the Parties. Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) Power and Authority. Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) Authorization. The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) Binding Obligation. Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. Effectiveness. This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. Governing Law; Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

NY 241,427,856v1 9-1-11

11. <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. <u>Specific Performance</u>.  It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. <u>Prior Negotiations</u>.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. <u>Rights and Remedies</u>.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. <u>Notices</u>.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

    a.    <u>If to the Debtors</u>:

        Harry Jeremias
        The Harsh Group
        891 Second Avenue, 22nd Floor
        New York, New York 10017
        Tel: 212.725.6481
        Fax: 212.725.6480

- 4 -

E-mail: Harry@HARCHgroup.com

with a copy to:

b.   If to Ramapo:

Ramapo Lighting and Electric
Attn: [name]
32 South Central Avenue
Spring Valley, NY 10977
Tel: [phone]
Fax: [fax]
E-mail: [e-mail]

with a copy to:

Solomon Rosengarten
1704 Avenue M
Brooklyn, NY 11230
Tel: 718.627.4460
Fax: [fax]
E-mail: [e-mail]

19. Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. Representation by Counsel.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

*[signature page follows]*

RAMAPO LIGHTING AND ELECTRIC

By: _____

Name: ABRAHAM SCHEDANTZ
Title: Pres,

216 WEST 8 HOLDER LLC, 216 WEST 18 MEZZ
LLC AND 216 WEST 18 OWNER LLC

By: _____

Name:
Title:

*NY 241,427,856v1 9-1-11*

# EXHIBIT H

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September **8**, 2011, is entered into by and among Secure Door and Hardware Inc. ("Secure Door") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Secure Door and the Debtors are herein referred to as the "Parties."

### RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Secure Door holds a claim in the amount of $15,816.28 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2. Plan Support. Secure Door agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Secure Door, to perform and comply with the following obligations, as applicable:

(a) Secure Door will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be proposed

by the Debtors or (ii) any other restructuring or reorganization for, or the liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

(b) Secure Door will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

(c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided*, *however*, that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

3. <u>Satisfaction of the Claim</u>. Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $3,100 to Secure Door (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Secure Door shall have no further recourse against the Debtors or interest in the Debtors' estates.

4. <u>Transfer Restriction</u>. Secure Door shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

5. <u>Termination</u>.

(a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

(i) with the mutual written consent of Secure Door and the Debtors at any time;

(ii) if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

(iii) if the Court denies confirmation of a Qualified Plan;

(iv) if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

(v) any of the Chapter 11 Cases is dismissed;

(vi) if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an

order confirming any plan of reorganization for the Debtors other than a Qualified Plan).

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. <u>Modification of Agreement</u>. No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Secure Door.

7. <u>No Solicitation</u>. Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. <u>Representations and Warranties of the Parties</u>. Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority</u>. Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) <u>Authorization</u>. The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) <u>Binding Obligation</u>. Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. <u>Effectiveness</u>. This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. Each Party irrevocably and unconditionally agrees that the Court

will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

11. Headings. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. Specific Performance. It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. Prior Negotiations. This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. Rights and Remedies. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

a.    If to the Debtors, to:

Harry Jeremias
The Harsh Group
891 Second Avenue, 22nd Floor

New York, New York 10017
Tel: 212.725.6481
Fax: 212.725.6480
Email: Harry@HARCHgroup.com

with a copy to:

Jeffrey H. Kaufman, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Tel.:212.592.1409
Fax: 212.545.3345
jkaufman@herrick.com

b.    If to Secure Door, to:

Secure Door and Hardware Inc.
Attn:  Alex Kachka
265 46th Street
Brooklyn, NY 11220
Tel: (718) 492-1222
Fax: (718) 492-0045
Email: alex@sdhinc.com

with a copy to:
ANI Management Group
Attn: Michael Cohen
15 Ives Road
Hewlett, NY 11557
Tel: (516) 569-7250
Fax: (516) 569-7317
Email: MCohen@ANIcollect.com

19. Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. <u>Representation by Counsel</u>. Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

SECURE DOOR AND HARDWARE INC.

By: _____

Name: _____

Title: _____

216 WEST 8 HOLDER LLC, 216 WEST 18 MEZZ LLC AND 216 WEST 18 OWNER LLC

By: _____

Name:

Title:

# EXHIBIT I

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of September 8, 2011, is entered into by and among Rotavele Elevator, Inc. ("Rotavele") and 216 West 18 Holder LLC ("Holder"), 216 West 18 Mezz LLC ("Mezz Borrower") and 216 West 18 Owner LLC ("Owner" and collectively with Holder and Mezz Borrower, the "Debtors"). Rotavele and the Debtors are herein referred to as the "Parties."

### RECITALS

WHEREAS, the Debtors contemplate commencing cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, Rotavele holds a claim in the amount of $110,514.17 against one or more of the Debtors (the "Claim"), and it represents and warrants that is has no other claims against any of the Debtors other than the Claim;

WHEREAS, as part of the Chapter 11 Cases, the Debtors contemplate filing a chapter 11 plan and an accompanying disclosure statement, both of which provide for, among other things, (i) the transfer of 216 West 18th Street, New York, New York (the "Property") to a newly formed special purpose entity ("SPE"), which will acquire and refinance the senior claim (the "Senior Claim") that is secured by the Property; (ii) the same treatment of all claims that are in the same class as the Claim; (iii) an opportunity for HAJ 18 LLC, a current equity holder of the Debtors, to invest new money for an equity interest in the SPE; and (iv) the cancelation of existing equity of the Debtors (a "Qualified Plan").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals Incorporated. The recitals set forth above are incorporated herein by reference.

2. Plan Support. Rotavele agrees, for the benefit of the Debtors, and the Debtors agree, for the benefit of Rotavele, to perform and comply with the following obligations, as applicable:

(a) Rotavele will not directly or indirectly pursue, propose, support, recommend or encourage the pursuit, proposal or support of (i) any chapter 11 plan for the Debtors other than a Qualified Plan described above to be proposed by the Debtors or (ii) any other restructuring or reorganization for, or the

liquidation of, any of the Debtors (directly or indirectly), other than a Qualified Plan;

(b) Rotavele will not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, a Qualified Plan;

(c) each Party will negotiate in good faith all other documents and transactions described in, or contemplated in connection with, this Agreement and the applicable provisions of the Plan;

*provided, however*, that, for the avoidance of doubt, nothing in this Section 2 shall be deemed to be an agreement by any Party to vote to accept or reject any plan of reorganization for the Debtors.

3.  <u>Satisfaction of the Claim</u>.  Upon the effectiveness of a Qualified Plan pursuant to a final, non-appealable order of the Court, the Debtors shall distribute an amount of $21,661.00 to Rotavele (the "<u>Distribution</u>"), in full satisfaction of the Claim. Upon receipt of the Distribution, Rotavele shall have no further recourse against the Debtors or interest in the Debtors' estates.

4.  <u>Transfer Restriction</u>.  Rotavele shall not sell or otherwise transfer the Claim unless the counterparty to such transfer agrees in writing to be bound by this Agreement.

5.  <u>Termination</u>.

(a) This Agreement shall terminate and all obligations of the Parties shall immediately terminate and be of no further force and effect as follows:

(i)    with the mutual written consent of Rotavele and the Debtors at any time;

(ii)   if the Debtors provide written notice that they will not commence the Chapter 11 Cases;

(iii)  if the Court denies confirmation of a Qualified Plan;

(iv)   if any court of competent jurisdiction shall declare, in a final, non-appealable order, this Agreement to be unenforceable;

(v)    any of the Chapter 11 Cases is dismissed;

(vi)   if the Court (x) grants relief that is materially inconsistent with this Agreement or a Qualified Plan in any respect or (y) enters an order confirming any plan of reorganization for the Debtors other than a Qualified Plan.

*NY 241,421,074v3 9-1-11*

(b) Upon any termination of this Agreement in accordance with the terms of this Section 5, this Agreement shall become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

6. <u>Modification of Agreement</u>.  No amendment, modification, waiver or other supplement of the terms of this Agreement shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and Rotavele.

7. <u>No Solicitation</u>.  Each Party hereby acknowledges that this Agreement is not, and shall not be deemed to be, a solicitation to accept or reject any plan of reorganization in contravention of section 1126(b) of the Bankruptcy Code.  Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8. <u>Representations and Warranties of the Parties</u>.  Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority</u>.  Such Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) <u>Authorization</u>.  The execution and delivery of this Agreement by such Party and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) <u>Binding Obligation</u>.  Upon execution, this Agreement is the legally valid and binding obligation of such Party and its respective successors and assigns, enforceable against each of them in accordance with the Agreement's terms.

9. <u>Effectiveness</u>.  This Agreement shall not become effective and binding on any of the Parties unless and until a counterpart signature page to this Agreement has been executed and delivered by each of the Parties.

10. <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York.  Each Party irrevocably and unconditionally agrees that the Court will retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.

11. _Headings_.  The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

12. _Specific Performance_.  It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

13. _Prior Negotiations_.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof.

14. _No Third-Party Beneficiaries_.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15. _Severability_.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16. _Rights and Remedies_.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

17. _Successors and Assigns_.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

18. _Notices_.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses:

    a.    If to the Debtors:

        Harry Jeremias
        The Harsh Group
        891 Second Avenue, 22nd Floor
        New York, New York 10017
        Tel: 212.725.6481
        Fax: 212.725.6480

- 4 -

Email: Harry@HARCHgroup.com

with a copy to:

b.  If to Rotavele:

Rotavele Elevator, Inc.
Attn: [name] Alan Zaretsky
[address] 414 Seneca Ave. Ridgewood, NY 11385
Tel: [phone] 718 386 3000
Fax: [fax] 718 386 4366
Email: [e-mail] alan-z@contractor-services.net
with a copy to: M.J. Schwab
Abelman Frayne & Schwab
666 Third Ave., NY, NY 10017

19. Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20. Representation by Counsel.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

*[signature page follows]*

ROTAVELE ELEVATOR, INC.

By: _____

Name: Alan Zaretsky
Title: President


216 WEST 8 HOLDER LLC, 216 WEST 18 MEZZ
LLC AND 216 WEST 18 OWNER LLC

By: _____

Name:
Title:

NY 241,421,074v3 9-1-11

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

---

**216 West 18 Owner LLC, 216 West 18 Mezz LLC, and 216 West 18 Holder LLC,**

**Debtors.**

c/o Steven A. Carlson
**Chief Restructuring Officer**
**45 Adams Road**
**Easton, Connecticut 06612**

---

## BALLOT FOR CLASS 3 - OWNER GENERAL UNSECURED CLAIMS

IMPORTANT: NO CHAPTER 11 CASE HAS BEEN COMMENCED
AS OF THE DATE OF THE DISTRIBUTION OF THIS BALLOT

BALLOT FOR ACCEPTING OR REJECTING
PREPACKAGED PLAN OF LIQUIDATION OF
216 WEST 18 OWNER LLC, 216 WEST 18 MEZZ LLC, AND 216
WEST 18 HOLDER LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

| **IMPORTANT** |
| --- |
| **VOTING DEADLINE: 5:00 P.M., EASTERN TIME ON OCTOBER 26, 2011.** <br><br> REVIEW THE ACCOMPANYING DISCLOSURE STATEMENT FOR THE PLAN. <br> DO NOT RETURN ANY SECURITIES WITH THIS BALLOT. This Ballot is *not* a letter of transmittal and may *not* be used for any purpose other than to cast votes to accept or reject the Plan. |

216 West 18 Owner LLC; 216 West 18 Mezz LLC; and 216 West 18 Holder LLC (collectively, "216 West 18") are soliciting votes with respect to the *Debtors' Prepackaged Liquidating Chapter 11 Plan*, dated September 26, 2011 (the "Plan"), which is described in the *Disclosure Statement for the Debtors' Prepackaged Liquidating Chapter 11 Plan*, dated September 26, 2011 (the "Disclosure Statement"), both of which are included herewith.

216 West 18 may commence a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") after this solicitation, but has not yet done so. Accordingly, neither the Disclosure Statement nor the Plan has been

approved by any court. All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class that vote on the Plan, and by the holders of two-thirds in amount of equity security interests in each class that vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the class or classes rejecting it, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

Only holders of (i) Class 2 - Mortgage Lender Claim and (ii) Owner General Unsecured Claims are entitled to vote on the Plan.

THIS BALLOT IS TO BE USED FOR VOTING BY OWNER GENERAL UNSECURED CLAIMS ONLY. In order for your vote to be counted, this Ballot must be properly completed, signed and returned so that it is actually received by Lloyd A. Palans, Bryan Cave LLP, 1290 Ave. of the Americas, New York, NY 10104 (the "Balloting Agent"), no later than 5:00 p.m. Eastern Standard Time on October 26, 2011 (the "Voting Deadline"), unless such time is extended by 216 West 18 in writing. Otherwise, the vote transmitted by this Ballot will not be counted. If confirmed, the Plan will be binding on you whether or not you vote.

216 West 18, in its sole discretion, reserves the right to terminate this solicitation at any time prior to the Voting Deadline, or to extend the Voting Deadline. Any such termination or extension shall be followed as promptly as practicable by notice thereof.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT AT THE FOLLOWING ADDRESS AND TELEPHONE NUMBER:

By U.S. mail, UPS, FedEx, hand delivery, facsimile, electronic mail or overnight courier:

Lloyd A. Palans
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2087
Facsimile: (212) 541-4630
E-mail: lapalans@bryancave.com

Please note that the Balloting Agent cannot provide legal advice or direct you to either accept or reject the Plan. You may wish to seek legal advice concerning the Plan and the classification and treatment of your claim under the Plan.

---

### VOTING INSTRUCTIONS

1. REVIEW AND COMPLETE ITEM 1.

2. Cast ONE vote to accept or reject the Plan by checking the proper box in Item 2.

3. REVIEW THE CERTIFICATIONS CONTAINED IN ITEM 3.

4. **SIGN THE BALLOT** - Your original signature is required on the Ballot in order for your vote to count.

5. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing, and provide proof of your authorization to so sign.

6. RETURN THE BALLOT IN THE PRE-ADDRESSED POSTAGE-PAID ENVELOPE (if the enclosed envelope is addressed to your nominee, make sure your nominee receives your Ballot in time to submit it before the Voting Deadline).

7. If you believe you received the wrong form of Ballot, or if you need additional Ballots, please immediately contact the Balloting Agent.

8. If multiple Ballots are received from the same person with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballot. However, if a holder of a Claim casts Ballots received by the Balloting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

9. Any Ballot that is illegible or that contains insufficient information to permit the identification of the claimant or interest holder will not be counted.

10. Properly executed Ballots that attempt to partially accept and partially reject the Plan will not be counted.

11. After the Voting Deadline, no Ballot may be withdrawn or modified without the prior consent of 216 West 18, which consent shall be given in 216 West 18's sole discretion.

12. This Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim.

13. If you hold Claims in more than one class under the Plan, you may receive more than one Ballot for each different class. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you receive.

14. Do not return any debt instruments or equity securities with your Ballot.

**Item 1.** **BASIS OF CLAIM.** The undersigned certifies that the undersigned was the holder of an Owner General Unsecured Claim in the following aggregate unpaid principal amount (insert amount in the box below).

$ _____

**Item 2.** **CLASS 2 (OWNER GENERAL UNSECURED CLAIM) VOTE.** The holder of the Owner General Unsecured Claim set forth in this Ballot hereby votes as follows (check one box only, if you do not check a box your vote will not be counted).

☐ **Accept** the Plan. ☐ **Reject** the Plan

**Item 3.** **CERTIFICATION.** By signing and returning this Ballot, the holder of the Owner General Unsecured Claim identified in this Ballot certifies that it:

a. is the holder of the Owner General Unsecured Claim to which this Ballot pertains and has full power and authority to vote to accept or reject the Plan with respect to the Owner General Unsecured Claim;

b. has received a copy of the Plan and the Disclosure Statement (including the exhibits thereto) and acknowledges that the solicitation of votes for the Plan is subject to all the terms and conditions set forth in the Plan and the Disclosure Statement;

c. has carefully read the Ballot and the accompanying instructions;

d. has not submitted any other Ballot relating to the Owner General Unsecured Claim listed herein that is inconsistent with the vote as set forth in this Ballot or that, if any such other Ballot was previously submitted, it either has been or are hereby revoked or changed to reflect the vote set forth herein; and

e. understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Owner General Unsecured Claim, and every obligation of the undersigned hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name: _____
(Print or Type)

Social Security or Federal Tax I.D. No.: _____
(Optional)

Signature: _____

By: _____
(If Appropriate)

Title: _____
(If Appropriate)

Street Address:_____

City, State, Zip Code:_____

Telephone Number: ( )_____

Date Completed:_____

    No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan.

---

**YOUR VOTE MUST BE FORWARDED IN AMPLE TIME FOR YOUR VOTE TO BE RECEIVED BY LLOYD A. PALANS, BRYAN CAVE LLP, 1290 AVE. OF THE AMERICAS, NEW YORK, NY 10104, BY 5:00 P.M., EASTERN TIME, ON OCTOBER 26, 2011, OR YOUR VOTE WILL NOT BE COUNTED. IF THE ENCLOSED ENVELOPE IS ADDRESSED TO YOUR NOMINEE, MAKE SURE YOUR NOMINEE RECEIVES YOUR BALLOT IN TIME TO SUBMIT IT BEFORE THE VOTING DEADLINE.**

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CALL LLOYD A. PALANS AT (212) 541-2087.**